*Philadelphia, Monday, July 25.*

## M'ALLISTER *against* MARSHALL.

An assignment executed by an insolvent debtor, with an understanding, that part of the property assigned shall be conveyed to trustees for the use of his family, is so far as it respects the property conveyed in trust for the family, fraudulent and void as to all creditors who do not assent to the arrangement; and the non-assenting creditors may take it in execution.

THIS was an ejectment for a brick messuage and lot of ground, situated on the south side of *Chesnut* street in the city of *Philadelphia.*

The cause was tried before the Chief Justice in *November* last, when by consent a verdict was entered for the defendant, subject to the opinion of the Court upon the evidence, which by the report of his honour was as follows:

The plaintiff, who was a *bona fide* creditor of *Charles Marshall* the defendant and his son *Charles Marshall* jr. at the time of the assignment hereafter mentioned, instituted a suit against them in this Court to *September* term 1805, obtained a judgment at *March* term 1806, issued his *fi. fa.* for 2904 dollars 50 cents in *December* following, by virtue

of which the premises in question were levied on as the property of the defendant, and on the 5th of *April* 1807, became the purchaser at sheriff's sale for the sum of 5000 dollars. At the time of the sale the plaintiff had notice of a claim to the property by *Thomas Parker* and others, trustees of the defendant's wife and children; and upon receiving his deed from the sheriff, he paid him only 140 dollars 59 cents the amount of the costs, and retained in his own hands the amount of the purchase money, to wait the event of this suit.

The title under which the defendant asserted his possession, stood as follows: *Charles Marshall* and *Son* having stopped payment, a general meeting of their creditors took place in the city of *Philadelphia* on the 8th of *January* 1805, when *Henry Pratt, John Morrell* and *William Smith*, were chosen assignees, and were directed to examine the books, accounts and affairs of the debtors, and to report to the creditors at another meeting, their opinion of measures best for the creditors, and also for *Charles Marshall* and *Son*. The number of creditors who attended this meeting, or the amount of debts due to them, did not appear; nor did it appear that any report was made.

A power of attorney bearing date the 28th of *January* 1805, was executed to the persons above named as assignees, by fifty seven of the general creditors, authorizing them " to settle, compromise with, and receive from the said " *Charles Marshall* and *Son* jointly or separately, for our use " and on our accounts, such monies, goods, properties or " effects to be assigned to our use by the said *Charles Mar-* " *shall* and *Son* jointly or separately, or any other person or " persons on their account, as they the said attornies may " think proper; and to accept the same in full satisfaction and " payment of our and each of our demands; and in our and " each of our behalves to sign and execute to the said " *Charles Marshall* and *Son* jointly or separately, *a receipt* " *in full, release, or releases under seal, or other lawful ac-* " *quittance of all demands &c.; and to make with them or any* " *other person on their behalf, on our accounts respectively,* " *such contract, composition, conveyance or assurance, as* " *under all the circumstances of the case they may deem most* " *advisable;* and to dispose of and convert into money all " the property or debts to be received as aforesaid, and pay

1814.

M'ALLISTER
v.
MARSHALL.

340

"the same, and all other money to be received under this "trust, equally and rateably among us, in proportion to our "several demands." The execution of this power by 37 creditors was proved by a subscribing witness on the 5th of *April* 1805, by one other on the 6th, by 15 others on the 16th *August* following, and the execution by four others was not proved. A like power was given by five lien creditors, saving their respective liens, dated the 31st of *January* 1805, and executed on the 9th, 11th and 12th of *February*. The plaintiff never signed the power, nor assented to the proceedings.

On the 14th of *February* 1805, *Charles Marshall* and *Son*, by their deed duly executed, reciting the two powers of attorney, in consideration thereof and of one dollar, transferred and conveyed to the said assignees all their property real personal and mixed, including the premises in the ejectment, which then belonged to the father, in trust, that they or the survivor should sell the real estate and collect the debts, and pay and distribute the money thence arising, in equal proportions to and among the joint and several creditors of the said *Charles Marshall* and *Son*, or either of them, (provided the sum to be paid to the separate creditors of *Charles Marshall* junior did not exceed 400 dollars) "*who shall accept the same in full and absolute satisfaction* "*and discharge of their respective claims and demands, and* "*who have already executed, or shall, if resident in America,* "*within six months from the date hereof, or if resident in* "*Europe, within twelve months from the date, execute the* "*said power of attorney.*" The witnesses to this deed were *Benjamin Marshall* and *Joseph Scott*.

By deed dated *the next day*, the assignees "by virtue and "in pursuance of powers vested in them by the creditors of "*Charles Marshall* and *Son*, and in consideration of one "dollar paid to them by the grantees, and for divers other "good considerations," conveyed to *Thomas Parker, Joseph Morris*, and *Thomas Morris* junior, the premises in the ejectment, a ground rent of 15*l.* 5*s.* 0*d.* per annum, and all the plate and household furniture in the house, "*in* "*trust for the sole and separate use of Patience Marshall,* "*wife of the said Charles Marshall, for her life, and after* "*her death for the use of her daughters Elizabeth, Pa-*

" tience, and *Mary Ann*, as tenants in common in fee simple," with power in the mother to devise the premises for seven years; the grantors providing at the same time, that they should not be considered as covenanting that they had lawful authority to make the conveyance, but only as passing their right, title and interest, as derived from the conveyance made to them by the said *Charles Marshall* and *Son*, and the power vested in them by the creditors. The witnesses to this deed were also *Benjamin Marshall* and *Joseph Scott*.

On the 9th *May* 1806, the assignees, by virtue of the two powers, executed a full and complete release to *Charles Marshall & Son*, of all claims and demands of the creditors who had signed them.

The debts of *Charles Marshall & Son* amounted to about 113,000 dollars. The property assigned for the use of the creditors, yielded about 51,000 dollars, exclusive of what was given to the wife and children, which was variously estimated, but was reasonably worth 10,000 dollars. The creditors who released, had received before the trial, about 37½ per cent. on their debts, and there remained about 1100 dollars to be distributed.

It did not appear at what time the power of attorney of the 28th *January* 1805 from the creditors was executed; but it was probable that a majority of them signed it before the assignment.

All the real estate belonged exclusively to *Charles Marshall* at the time of the assignment.

The question was whether the deed of assignment, and subsequent conveyance in trust for the family of *Charles Marshall*, were sufficient to protect the property from the plaintiff's execution.

*Hopkinson* and *Tilghman*\* for the plaintiff. The point in question is whether a debtor can by agreement with some of his creditors, exempt part of his property from the demands of the others. That this has been the case here cannot be doubted. The assignment of the 14th, and the conveyance of the 15th *February*, are clearly one transaction, proceeding

1814.

M<sup>c</sup>ALLISTER
*v.*
MARSHALL.

---

\* Mr. *Tilghman* represented another judgment creditor of the defendant, who had neither signed the power of attorney, nor assented to the proceedings.

1814.

M‘ALLISTER
v.
MARSHALL.

from the same agreement, executed at the same time, and before the same witnesses, and were the result of a compromise between the debtor and the attornies of his creditors. It is not the case of an absolute surrender of all the debtor's property, and a subsequent free gift of part by the creditors; but it is the nominal surrender of the whole, upon a previous stipulation and compact that part should be returned. Far as our Courts have gone, they have never come up to this. They have never permitted a debtor to make the law for his creditors, as to the amount which he should surrender, but merely as to the terms upon which the whole should be accepted. The utmost reach of kindness to him has been to permit his demanding a release, as in *Lippincott* v. *Barker* (a); but in that case it will be recollected, that until the death of the late judge *Smith*, the Court were equally divided, and that the majority, who ultimately ruled it, only recognize the release, where a sufficient number of creditors to absorb the whole property, sign it before an execution appears. In this case the premises were never out of *Charles Marshall*. The agreement that the assignees should give it to his family, was in point of law fraudulent and void, as to all creditors who did not assent. It was himself that gave, or rather that attempted to give to *his* family; an abortive attempt, which passed nothing, but left the property in him as it stood before. If it passed by the assignment, the legal estate was in the assignees in trust for the creditors, who having signed a release, the property reverted to the grantor, subject to our exceptions.

The assignment is void as to the plaintiff for another reason. Before he could receive any thing, he was obliged not merely to sign a power of attorney to execute a release, but also to make any contract, composition, conveyance or assurance, which the attornies might deem most advisable; that he should surrender his own judgment, his own will, his entire demand, into the hands of third persons, to do with it precisely as they pleased, and to return to the debtor any part short of the whole of his property. This is a condition too monstrous to be tolerated. One creditor cannot force another to make a present to the debtor, and to take what persons not of his own choosing may say he ought to have:

(a) 2 *Binn.* 174.

and although most of the creditors agreed to this, that does not alter the case, but shews how perfect the scheme of coercion was, and that the toleration of it will make debtors the masters of their creditors. Though we have not paid the sheriff, he is liable for the purchase money if we succeed. We however only want our money; and we are willing that the judgment, if entered for the plaintiff, shall be defeasanced upon payment of the principal, interest and costs of the two judgments, although the premises are worth double the sum.

*Levy* and *Ingersoll* for the defendant. The plaintiff cannot dispossess the defendant, because upon his own shewing the latter is entitled to the possession. He has an equitable right to the house, until the difference between the plaintiff's judgment and the amount of the sheriff's sale is paid him. *Chapman* v. *Tanner* (a), *Walker* v. *Preswick* (b), *Fawell* v. *Fawell* (c).

But the assignment was good. Where is the fraud, if, when there is no bankrupt law, the creditors and debtor make compromises upon the principle of the bankrupt law? They have done no more here. Sixty-six out of sixty-nine creditors have agreed to the arrangement. The debts due to those creditors amounted to nearly twice the value of all the real and personal property of *Charles Marshall & Son*. They have given to his family a portion of what he had given to them, or if the plaintiff prefers it, they agreed to give it before the assignment, for it makes no difference. They had a right to do so. A debtor may prefer certain creditors; he may exclude others; he may make a release the condition of his preference; he may convey to them the whole or any part of his estate not exceeding their debts, which they may accept in satisfaction, and do with it as they please. Then construing the arrangement in the strongest way against him, he has given to certain creditors, in exclusion of the plaintiff, all his property for debts nearly double its amount; and they, whose contracts with the debtor do not concern the excluded person, have previously agreed to release him, and to convey part of the property for his family. If he had given them more than the amount

(a) 1 *Term.* 267.　　(b) 2 *Ves.* 622.　　(c) *Ambl.* 724.

1814.

M'ALLISTER
v.
MARSHALL.

of their debts, the case would have been different; but when he could have absolutely preferred these creditors, and as absolutely have excluded the plaintiff, and have made the same agreement with the former which it is alleged was made here, how can the plaintiff object that he has been excluded virtually. *Charles Marshall's* family have none of his property, but the property of the creditors who signed the power; and the creditors had a right to give his family a part, because the whole did not amount to a complete, satisfaction. Every thing that was done, proceeded from assignees chosen by the creditors, and possessing their confidence. It was not a case in which the creditors were subject to the law of the debtor, to by any means the extent of *Wilt* v. *Franklin* (a), where he chose his own assignees even without their consent, and made all his arrangements at his own pleasure.

But if the conveyance to the trustees of the wife is void, the legal estate nevertheless passed to the assignee of *Marshall* in trust for the creditors. It did not remain in *Charles Marshall*, nor was there a trust for him. The plaintiff therefore purchased nothing at the sheriff's sale.

TILGHMAN C. J. after particularly stating the case, delivered his opinion.

When the cause was argued, I strongly inclined to the opinion that the trust might be supported, because the creditors by whom it was created, had debts fairly due from *Charles Marshall* and *Son*, to a much greater amount than the value of their whole property; so that the relinquishment of part in favour of the family, seemed no more than giving up what was their own: and although this view of the case is just, so far as concerns the debtor and those creditors who wished to provide for his family, yet on full consideration of the bearing of this transaction on other creditors, I have been induced to alter my opinion. We have no bankrupt law. In considering therefore what an insolvent debtor may do, and what he may not do, as to the disposal of his estate, we must have recourse to the common law, and the provisions of the statute, 13 *Eliz. c. 5.* The debtor may prefer one creditor to another, and for this pur-

(a) 1 *Binn.* 502.

pose he may make a conveyance of any part of his property at its fair value. But he cannot under a pretence of preferring one creditor, make a conveyance for the purpose of hindering others from coming at his property, nor above all can he by any mode of contrivance or secret trust, cover any part of his effects from the legal process of any of his creditors. If *Charles Marshall* had proposed to part of his creditors to accept a conveyance of his whole estate, for the purpose of excluding all others, who would not consent that a portion of it should be secured for his wife and children, it cannot be doubted but the proposal would have been fraudulent, and its acceptance by the creditors could not have washed away the stain. I do not believe that Mr. *Marshall* intended in fact to defraud, and I am very sure, from personal knowledge of many of the creditors, that they were actuated solely by motives of benevolence. But we must discard all private knowledge or conjecture, and consider the case as it is presented on the written evidence. Now when I look at the assignment, and the reconveyance of part of the assigned property in trust for the family of the assignor, they appear to be one transaction, as much as if the whole had been contained in the same deed. I must take it, that part of the consideration of the assignment was, that there should be a reconveyance; in other words the assignment was executed, with an understanding that the family should be provided for by a gift of the house and lot. The condition imposed on all the creditors who had not executed the power of attorney, was unreasonable; not only were they to release all demands, but also to leave it to the discretion of persons whom they had not chosen, to relinquish at their pleasure any portion of the property received from their debtors. This is going further than is warranted by the decisions of this or any other court. In *Lippincott* v. *Barker*, it was held, that an assignment of *all the debtor's property*, to be equally divided among all the creditors who should sign a release within a given time, was valid. The opinion of the Court was restricted to the particular circumstances of that case, in which creditors, to a greater amount than the whole estate, as soon as they were informed of the assignment, agreed to accept it, and executed releases. If the *Marshalls* had made an absolute conveyance of their whole

1814.          estate to any number of creditors whose debts were fairly
M'ALLISTER equal to the estate, it would have been good, and those cre-
*v.*          ditors might afterwards have done what they pleased with
MARSHALL. it. But that is not the case. Who can say that the assign-
ment would have been executed, without the agreement to
reconvey a part?

Very important consequences are involved in the de-
cision of this cause. If the trust deed be supported, it will
be an inducement for every insolvent debtor, to insist
on a provision for his family. And he will accomplish his
object, if he can but prevail on a number of creditors, who
have debts equal to his whole estate, to accept his offer.
There will not be wanting powerful motives to join in this
scheme. Each creditor will reflect, that if he refuse he may
lose every thing. What the law authorizes, he has no reason
to think unjust or immoral, and then even honest men may
fall into a practice, which, without any ill intention on their
part, will be ratifying under the sanction of this Court a sys-
tem of fraudulent bankruptcy. It is no satisfaction to the
excluded creditors to tell them, that they have their remedy
by actions against the defendant. Their actions are fruitless,
because by the laws of *Pennsylvania*, every defendant who
surrenders his property for the use of his creditors, is dis-
charged from imprisonment. But his wife and children are
not obliged to surrender *their* property. If then we decide
that the property is legally vested in the wife and children,
it will remain to them, and the head of the family will
nevertheless be entitled to his discharge. These are the
considerations which have induced me to be of opinion, that
the assignment was void, so far as concerns those creditors
who refused to accept it. Consequently the property in ques-
tion, having never passed from *Charles Marshall*, was sub-
ject to the execution of the plaintiff, who is entitled to judg-
ment in this ejectment.

YEATES J. A legal objection has been raised to the
plaintiff's recovery in this case, founded on his subscription
in the sheriff's docket. He has paid only 140 dollars 69 cents,
the amount of the costs of his action against *Charles Mar-
shall* and *Son*, and retained in his own hands the amount of
the purchase money. Suppose the amount of his debt and
interest at the time of the execution of the deed to be 2962

dollars 93 cents, this sum added to the costs paid, there would remain 1896 dollars 38 cents to be paid by him out of the consideration money of 5000 dollars. I see no force in this objection. The sheriff has signed a receipt for the purchase money, and has acknowledged the deed. He is therefore liable for the balance of 1896 dollars 38 cents, to the party who may lawfully demand it. Should the plaintiff succeed in the present instance, he would become responsible to the sheriff under his written engagement. But should he fail therein, there could be no reason whatever to charge him with the balance. It cannot be pretended, that while the wife and daughters of *Charles Marshall* hold and enjoy the premises in question, the purchaser at the sheriff's sale should, after losing his debt and costs, pay him the surplus of the purchase money.

More serious difficulties, arising from the peculiar circumstances of this case, occur to our consideration. [His honour here particularly stated the facts.]

The doctrine of assignments executed in favour of creditors by an insolvent debtor, has been much agitated, and has undergone the full consideration of this Court in the late cases of *Wilt* v. *Franklin*, 1 *Binney* 502, and of *Lippincot* v. *Barker*, 2 *Binney* 174. In the last case it was held by a majority of the Court, that an assignment by a debtor of *all* his property to trustees, for the benefit of such creditors as should within four months execute a release of all demands, was good, provided certain creditors agreed to accept it on that condition. I see no cause to recede from my opinion delivered in that case. I freely admit, that independently of the bankrupt laws, a debtor may prefer one set of creditors to another, and that such a measure would neither be illegal nor immoral. The present case goes much farther. From the internal evidence, which the two powers of attorney, the deed of assignment of the 14th *February*, and the release to the trustees of the next day, carry with them, independently of the circumstance of the two last deeds being attested by the same witnesses, I am constrained to conclude, that the assignment was made in full and perfect confidence, that Mrs. *Marshall* and her daughters should receive the provision contained in the release, and that this was the great leading motive to make the assignment. The

M'ALLISTER
v.
MARSHALL.

creditors at their first meeting directed the assignees whom they had chosen, to report the measures best for *themselves* and also for *Charles Marshall* and *Son*. The powers of attorney contemplate a compromise of mutual interest, and the proviso in the conclusion of the conveyance to the trustees, shews manifestly the sense of the parties on the whole transaction. I therefore consider the assignment and release, though purporting on the face of them to be made with an intervening day, as cotemporaneous acts depending on each other, and in fact as one instrument. Of course the question in my view of it is reduced to a single point, whether the assignment and release under these circumstances can legally bar such creditors as refuse to accede to those measures.

It has been urged, that one or more creditors may legally accept of an assignment of the whole or any part of the estate of their debtor in payment of their demands, provided it does not exceed in value the amount of his or their debts; and that being so entitled, they may convey it to whom they think proper. This is not *that* case. The terms held out to the creditors are unreasonably hard and severe. Unless they would surrender up their undoubted individual right of judgment, and subscribe the letter of attorney, giving a *carte blanche* to the assignees, ratifying the trust for the wife and children of *Charles Marshall*, they are excluded from any participation of the dividends. This appears to me a species of compulsion. I have no doubt that the most humane feelings for an unfortunate family, induced this arrangement, but my *moral sense* imperiously dictates to me, that until the debts of the head of the family are paid, his relatives cannot justly entitle themselves to any portion of his property.

The trust created by the assignees is certainly valid against the subscribing creditors, who by their subscription have assented to their acts. With their own property they might do as they pleased, and were under no control. But a composition made in order to exempt any part of the property from creditors, who might refuse their assent to the proffered terms, seems to me unavailing as to the dissenting creditors, and taints the whole transaction. *Lippincot* v. *Barker* was professedly decided by the majority of the Court under the peculiar circumstances of that case. From

the facts here shewn, I am fully satisfied that a trust for the family of *Charles Marshall* was originally intended by many of the creditors, which I cannot conceive binding on those creditors who have been unwilling to authorize that measure. I am not prepared to say, nor is it necessary that I should express an opinion, whether the humane views of the creditor might not have been effectuated in some other mode, or whether it could be done legally. The object of the assignment has ceased; the debts of the subscribing creditors have been fully released by their attornies in fact, constituted for that purpose with full and ample powers. Consequently the premises in question revested in the former owner as to non-subscribing creditors, and were liable to their execution.

I am therefore of opinion that judgment be entered for the plaintiff, to be defeasanced by the payment of principal interest and costs of the two judgments entered for the plaintiff and *John Erskine* against the defendant, in conformity to the terms proffered by his counsel in the course of the argument.

BRACKENRIDGE J. The following discourse which I have found amongst my papers, would seem to have some bearing on the case before us. It is part of a sermon from the 16th chapter of St. *Luke's* Gospel, beginning with the first verse. " There was a certain rich man, which had a steward, and " the same was accused unto him that he had *wasted his* " *goods*. And he called him and said unto him, how is it " that I hear this of thee? Give an account of thy steward-" ship, for thou mayest be no longer steward. Then the " steward said within himself, what shall I do? For my lord " taketh away from me the stewardship. I cannot dig, to beg " I am ashamed. I am resolved what to do, that *when I am* " *put out of the stewardship, they may receive me into their* " *houses*. So he called every one of his lord's debtors unto " him and said unto the first, how much owest thou unto " our lord, and he said *an hundred measures of oil*. And he " said take thy bill, and sit down quickly, and write *fifty*. " Then said he to another, and how much owest thou? And he " said *an hundred measures of wheat*. And he said unto him, " take thy bill and write *four score*. And the lord *commend-*

1814.

M'ALLISTER
v
MARSHALL.

" ed the *unjust* steward, because he had done *wisely;* for
" the children of this world are in their generation wiser
" than the children of light. And I say unto you, make you
" friends of the mammon of unrighteousness, that when ye
" *fail,* they may receive you *into everlasting habitations.*
" He that is faithful in that which is least, is faithful also in
" much; and he that is unjust in the least, is also unjust in
" much. If therefore ye have not been faithful in the un-
" righteous mammon, who will commit to your trust the
" true riches? And if ye have not been faithful in that
" which is *another man's,* who shall give you that which is
" *your own?* No servant can serve two masters; for either
" he will hate the one and love the other, or else he will
" hold to the one and despise the other. *Ye cannot serve God*
" *and mammon.*"

" This steward was an *insolvent man,* who was unable
" to pay over to his lord the monies which he had re-
" ceived, and for which he had become his debtor. He
" cast himself therefore about to settle the account in collu-
" sion with the debtors of his lord. The lord commended
" the unjust steward, not it is to be presumed, because he
" was unjust, but because he was necessitous. He had done
" wisely" for *that occasion,* and not what the *children of*
" *light* would do, but not more wisely for all times than the
" children of light would do, for I will venture *to say,* his
" lord would *never trust him again.*

" In our day and in this generation, the children of this
" world think themselves wise in defrauding their creditors,
" and doubtless they exhibit no small share of worldly wis-
" dom in the devices to which they resort in accomplishing
" that object. But my brethren, I take it there is but a shade
" of difference in law, and none at all in conscience, between
" highway robbery and the compelling a creditor to take
" less than his due, at the same time that by any contri-
" vance, or as the lawyers call it, shift, or chevisance, *you*
" *save something for yourself.*"

*So far the divine.* Would not the moralist say the same
thing? For what is *religion* but morality, with a sanction
drawn from a future state of rewards and punishments?
Would not the jurist say the same? For what is *law,* but
the enforcement of justice amongst men? The *reddere suum*
*cuique* is the definition of justice. Would not the politician

say the same? For the happiness of the social state, is but the aggregate of individual happiness, and this depends upon the *moral rectitude* of each one of the community. An honest man may not be able to pay his debts, owing to misfortune, or to disappointment in his calculations. But no honest man, or *child of light* as the divine would say, would withhold the rag upon his back, or upon that of his child, if the creditor who has a demand against him would insist upon pulling it off. He would not conceal a *rag*, or *annex a condition to the surrender of it*, that the creditor should *release all further claims on the future rag* which he might acquire by his labour and industry in life. But not so with *insolvent debtors*. They take the benefit of the act, and make a surrender of their effects upon oath; but there are few instances where there is not reason to suspect, that there is concealment in the surrender which they make, and this, from the evidence, that in most cases they are seen to emerge with sometimes not less and sometimes more ease of circumstances than before. As the heathen poet says to his mistress, it may be said to the insolvent when he has taken the oath,

> " *Simul obligasti*
> " *Perfidum votis caput, enitescis*
> " *Pulchrior multo,——*

He is like the chrysalis, that has cast its coat and taken wing; it shines away with a *splendor* which it had not before. In a proceeding towards creditors, independent of an *insolvent act*, I am unfavourable to the *debtor making a bankrupt law for himself.* An *unconditional* surrender of all his effects, until his debts are paid, if he surrenders at all, is the only principle that can receive my sanction in a court of justice. There are decisions to the contrary in this Court; but it will require *a series of decisions* by men of different educations and habits of thinking, before I can yield to them. If these decisions are founded in nature and truth, they will prevail, if not, they will go by the board. *Commenta hominum delet dies, judicia naturæ confirmat.*

At the same time that I thus withhold my assent to these decisions, I am far from inculcating an *unfeeling disposition* towards debtors. I say to the debtor, " do justice," to the

1814.

M'ALLISTER
v.
MARSHALL.

creditor, " love mercy," and this is the language of the scrip-ture. But I hold it the duty of the debtor to surrender himself to the *humanity* of the creditor, and not to attempt to take an undue advantage of his situation *as a* creditor, *and to impose terms.* And this will be found in the end to be the wisest course for the debtor himself, even with a view to his getting forward again in the world, notwithstanding what is *ironically* said in the text of the sermon, from which I have given an extract. And that it was *ironically* said in the opinion of the divine whom I have quoted, will appear from the concluding sentence of his discourse. " My breth-" ren," says he, " to conclude, the *children of light* who are " thought fools, are in reality wiser than these children of " the world. An unfortunate and insolvent man, who acts " fairly, will in ninety-nine instances out of an hundred, find " a better account in the credit of integrity which he will " establish, than in concealment, or a compulsory accept-" ance of *a part for the whole* on the part of the creditors. " For if there were not a generosity in man, there is a " secret operation of Providence, which attends and blesses " the industry of the honest. It is the language of the scrip-" ture, ' *I have been young and now am old, yet have I not* " *seen the righteous forsaken, nor his seed begging bread.*' "

In the case before us I am of opinion for the plaintiff, and upon this principle, were there nothing else in the case, that the term of a *release* was coupled with the surrender, and that time was given for creditors to come in, who might be willing to accept and give a release, which was to the *delay of other creditors*, who might choose to go on, and recover against the debtor. I consider it as a principle that ought not to be endured or made a part of the law.

Judgment for plaintiff.