## M'CLURG *Against* LECKY.

A debtor cannot in an assignment, make a reservation, at the expense of his creditors, of any part of his income or property, for his own benefit, nor can he stipulate for any advantage either to himself or family.

Such assignment is not only fraudulent and void, as regards the property reserved for the use of the debtor or his family, but is so *in toto.*

When the assignment is tainted with either moral or legal fraud, the property does not pass, but remains in the debtor, liable to the execution of those creditors who have not assented to the assignment.

Writ of error to the Common Pleas of *Allegheny* county.

This was an action of trespass brought by *Alexander M'Clurg, Sturly Cuthbert, James Cuddy, James Ekin,* and *George Ledlie* against *William Lecky, Esq.* Sheriff of Allegheny county, for taking and carrying away certain goods and chattels, which the plaintiffs alleged were theirs, and which the defendant had levied and sold as the property of *Morris B. Belknap,* by the authority of a *fieri facias* at the suit of *Robert T. Stewart*

*Morris B. Belknap* was the owner of a tract of land, upon which the "Pine Creek factory" was erected, and for which on the 8th March, 1827, he executed a deed of conveyance to the plaintiffs: the consideration mentioned in the deed was five thousand dollars. On the same day *Belknap* executed an assignment to the plaintiffs of all the engines, machinery, horses, wagons and other goods and chattels which were upon the premises, and which were enumerated in a schedule annexed to said assignment; and the following agreement was then entered into between them:

"Whereas *Morris B. Belknap,* by indenture bearing even date herewith, hath sold, released, enfeoffed and confirmed unto the said *M'Clurg* and *Co.* and *Ekin* and *Ledlie,* all that certain piece of land situate in *Indiana* township, on which are situate the buildings commonly called the *Pine Creek Factory:* and whereas, by a certain other writing, commonly called a bill of sale, also bearing even date herewith, the said *Morris B. Belknap,* hath sold and assigned unto the said *M'Clurg & Co.* and *Ekin* and *Ledlie,* all and singular, the engines, machinery and other articles whatsoever, in and belonging to the said "*Pine Creek Factory:*" and whereas also the said *M'Clurg & Co.* and *Ekin & Ledlie,* have agreed to stock the said factory, and to work and carry on the same. Now these articles of agreement witness, that the said *M'Clurg & Co* and *Ekin & Ledlie,* have agreed to employ; and hereby do employ, the said *Morris B. Belknap,* as agent, to superintend and conduct the business at the said "*Pine Creek Factory;*" and the said *Morris B. Belknap* doth hereby promise and agree, to and with the said *M'Clurg & Co.* and *Ekin & Ledlie,* that

he the said *Belknap* shall and will well and faithfully superintend and conduct the works, business, and operations, of said factory, and shall and will devote and give his labors and attention exclusively thereto; and whereas the said *Morris B. Belknap* is indebted to the said *M. Clurg & Co.* and *Ekin & Ledlie* in divers large sums of money; and whereas he, the said *Belknap*, is also indebted to sundry other individuals in large sums of money, for some of which judgments are now of record in the court of Common Pleas of *Allegheny* county, against said *Belknap*; and whereas the said *Morris B. Belknap* is unable to pay and satisfy said judgments and debts, and is also unable to stock and carry on the business of the said "*Pine Creek Factory*," and therefore sold and assigned the same, as aforesaid, to the said *M'Clurg & Co.* and *Ekin & Ledlie.* Now these articles of agreement further witness, that the said *M'Clurg & Co.* and *Ekin & Ledlie*, are to have two thirds, to wit, each of the said firms one third, of the annual profits of the business that shall be done at the said Factory, and of the rents and profits that shall annually arise, and grow out of the said one hundred acres of land and the houses and improvements thereon lying and being, and the remaining third part of the said annual profits, the said *Morris B. Belknap* is to have, and the said one third of the annual profits is to be appropriated to the maintenance and support of the said *Morris B. Belknap* and his family, and to the payment and extinguishment of the aforesaid debts and judgments, and in the payment of the said debts, those due by said *Belknap* to said *M'Clurg & Co.* and *Ekin & Ledlie*, are to have no priority or precedence, but after payment of the instalments due on the aforesaid judgments, the balance of the said one-third of the annual profits which shall not be needed and required, as aforesaid, for the maintenance and support of the said *Belknap* and his family, is to be paid in just proportions, to and among the other creditors, until their debts shall be fully paid and satisfied; and these articles of agreement do further witness, that the said *M'Clurg & Co.* and the said *Ekin & Ledlie*, their heirs or assigns, shall and will re-convey to the said *Belknap* his heirs or assignes, the said one hundred acres of land, with the appurtenances, and shall and will surrender and yield up to the said *Belknap*, his heirs, executors or assigns, the property sold to said *M'Clurg & Co.* and *Ekin & Ledlie*, by the aforesaid bill of sale, so soon as the judgments and debts aforesaid, shall be fully paid and satisfied, and so soon as the debts, responsibilities, expenses and obligations, which the said *M'Clurg & Co.* and *Ekin & Ledlie*, shall have incurred on account of said factory, and of this agreement shall be paid and satisfied; provided that in no event shall the said *M'Clurg & Co* and *Ekin & Ledlie* be required

. . (M'Clurg *v.* Lecky.)

to surrender and re-convey the aforesaid premises, and to terminate the arrangement by this agreement until the termination of five years after the date hereof, thence, and from thenceforth, the agreement hereby made, shall cease, determine and be void, and these articles of agreement do therefore witness, that in case of the death of the said *Belknap,* or in case sickness or other good cause shall prevent him, the said *Belknap,* from managing and superintending said factory, according to the true intent and meaning of these articles, then and in such case the said *M'Clurg & Co.* and *Ekin & Ledlie* shall employ another individual as agent and superintendent of the said factory, who shall be paid a reasonable salary out of the said one third part of the annual profits allowed said *Belknap* for the use of his creditors and support of his family. And whereas there are now due to the hands or workmen at said factory about twenty-three hundred dollars by said *Belknap* which said *M'Clurg & Co.* and *Ekin & Ledlie* have agreed to pay and satisfy. And whereas there are now in bank certain notes of said *M. B. Belknap,* on which said *Ekin & Ledlie* are endorsers, and which it is expected they will have to pay. Now these articles further witness, that the said money to be paid to said hands and workmen, and the money which shall or may be paid on account of said notes by said *Ekin & Ledlie* shall be paid and satisfied to said *M'Clurg & Co.* and *Ekin & Ledlie,* out of the said one third of the profits allowed as aforesaid to the said *Belknap,* and all further and other advances which said *M'Clurg & Co.* and *Ekin & Ledlie* shall or may make to pay and satisfy the debts due by said *Belknap,* shall also have priority and preference to all other debts and demands due by said *Belknap* In witness," &c

The deed, assignment and agreement were all recorded on the 14th May 1827. One of the subscribing witnesses to the papers, by whom they were all drawn, gave evidence that there was no secret trust, and none but what appeared upon the face of the papers. It also appeared, that the plaintiffs took possession of the works and personal property immediately upon the execution of the deed, assignment and agreement; employed different clerks, and were conducting the same, when the sheriff made his levy and sale, as hereafter mentioned.

On the 24th March, 1827, a *capias* was issued against *Morris B. Belknap* at the suit of *Robert T. Stewart,* requiring bail in six thousand dollars: on the same day the defendant was taken and confessed a judgment without stay of execution for three thousand five hundred and forty dollars and eighty cents, upon which a *fi. fa.* was immediately issued, and levied upon the personal property at the "*Pine Creek Factory,*" which was afterwards sold by the defendant for two thousand two hundred and ninety-two dollars and

twenty cents. Evidence was given, shewing that *Belknap* owed debts at the time of his arrangement with the plaintiffs, exceeding in amount thirty thousand dollars, and that he had no other property than that transferred, excepting some household furniture.

The court below submitted to the jury, whether the object the parties had in view was fraudulent and dishonest in point of fact; instructing them also, that the transaction was not so *per se,* in point of law.

The plaintiff assigned the following Errors.

1st. The court erred, in charging the jury, that the whole of the instruments of writing, bearing date the 8th day of March, 1827, were to be considered as forming but one deed.

2d. The court erred in charging the jury that there was no secret trust in the case, for the benefit of *Belknap.*

3d. In charging the jury, that the provision made for *Belknap* and his family by the articles of agreement, was a fair, lawful and valid one as against his creditors, and was not such a resulting trust for the benefit of *Belknap,* who was in failing circumstances, as would avoid the assignment as to his creditors.

4. In charging the jury, that the assignment made by *Belknap* of his personal property, was not calculated to delay, hinder or defraud creditors; and that the delivery of the possession thereof in the manner it was done, was sufficient to transfer and pass the right of property as against his creditors, and that the deed of assignment was good against them.

5. That by the record it appears that the judgment was given for the plaintiffs below, against the defendant; whereas by the law of the land, the judgment ought to have been given for the said defendant below, against the said plaintiff.

*Selden* and *Wilkins* for plaintiff in error, cited *Clow* v. *Woods,* 5 *Serg. & Rawle* 275. *Cunningham* v. *Neville,* 10 *Serg. & Rawle,* 201. *Babb.* v. *Clempson ib.* 419. *M'Allister* v. *Marshall,* 6 *Bin.* 338. 5 *Cowen* 566. 20 *Johns.* 442. 2 *Kent's Com.* 420-2-3, *Pasmore* v. *Eldridge,* 12 *Serg. & Rawle* 198. *Burd.* v. *Smith,* 4 *Dal.* 87. *Cowden* v. *Brady,* 8 *Serg. & Rawle* 510. *Dean* v. *Patton,* 13 *Serg. & Rawle* 345. *Wilt* v. *Franklin,* 1 *Bin.* 502. 2 *Pick.* 129. 1 *Hop.* 373. 5 *Cowen* 547. *Martin* v. *Mathiot* 14 *Serg. and Rawle* 214. *Cameron* v. *Montgomery* 13 *Serg. & Rawle* 131. 1 *Gallis.* 419. 2 *Kent's Com.* 414.

*Burke,* with whom was *W. Forward,* for defendant in error.

The assignment, under which the plaintiffs below claim the property in dispute is, by the finding of the jury, divested of the imputation of fraud, in fact. The *Stat.* 13 *Eliz.* in terms, annuls only such conveyances as are made with *intent* to defraud creditors. *Vide,* section 2d, of said statute, 2 *Ruff.* 588--9. By the 3d sec-

(M'Clurg *v.* Lecky.)

tion, it is an indictable offence; therefore there must be designed fraud. 1 *Bin.* 502. 1 *Attk.* 167. *Pr. Ch.* 285.    So of the *Stat.* 27 *Eliz.* 2 *Ruff.* 636, sections 2 & 3, where deeds, &c. are made to defraud purchasers.    The terms of the act do not embrace such as are *bona fide*, and for a valuable consideration, 3 *Cranch*, 88--9, 4 *Wheat.* 507.  11 *Wheat.* 205.    They are expressly excluded from the effect of the statutes. *Vide* section 6, *Stat.* 13 *Eliz.* and section 4, *Stat.* 27 *Eliz.* On this part of the case, the only question was as to intentional fraud, or fraud in fact, which was fairly left to the jury.    Here there was a good and valuable consideration for the deed.    It was *bona fide;* it was what it purported to be on the face of the papers. 7 *Wheat.* 579.    It covers no object not avowed; there was no secret agreement, contrary to what is expressed in writing.    If there was any such concealed agreement, then, the deed is embraced in the 3d section, *Stat.* 13 *Eliz.* If there was none, it is embraced in the 6th section, and the deed is good.    So the court charged the jury, leaving them to decide on the fact of a secret trust; and declaring that if they found affirmatively, it would avoid the deed.    The jury have negatived it.

The only question, then, can be, is the deed fraudulent in law? In order to decide this question, it will be proper to inquire what were *Belknap's* rights over this property, at the time that he made the deed in question; and what rights of his creditors were defeated by it.    The plaintiffs below were creditors of *Belknap* to a large amount.    They had endorsed for him, and rendered him many favors.    He might lawfully have preferred them to all other creditors; and he might have given such preference by judgment, mortgage or deed.    He might have defeated all his *existing* creditors, by giving a deed, or other sufficient security, for *future* advances. 1 *Burr.* 474. 2 *Johns. Ch.* 314--15. 7 *Cranch*, 34, 50. 2 *Johns. Ch.* 306--7.    An insolvent debtor may honestly place his property in such a situation as to prevent its being taken by process, for the purpose of prefering a creditor, or causing a just distribution.  14 *Johns. Rep.* 464.    That a debtor may prefer, has been repeatedly decided; 7 *Wheat.* 577.; and a creditor may be a party to the fraud, in order to avoid the deed. *Ibid.* 580. 11 *Wheat.* 79.    If, then, *Belknap* had conveyed all his property to the plaintiffs, the deed would have been good. The debts due them at the time would have been a good consideration; and thus *Stewart*, and all the other creditors, would have been cut out.    By the deed in question they have not been injured; for the arrangement made furnished the only hope of his future ability to pay his debts.    Why, then, should creditors complain?

But the deed is alleged to be bad, because of the reservation of an interest in *Belknap.*    No case has been cited, and none can be found in the books, where a reservation, (if such it can be called,)

(M'Clurg *v.* Lecky.)

like the one in question, was held fraudulent. He reserved no part of the property conveyed. It was only of part of the profits of the new establishment; and these profits to be created, not from what he owned at the time of the assignment; but from the advances and capital of the plaintiffs. His only interest was the support of himself and family, for which he was to devote his whole time. He was an artisan of uncommon skill. It was in full proof that his services were an ample consideration; they were of immense value to the concern. It has been shown that a general assignment to the plaintiffs, absolutely, would have been good. They might have stopped the works, and the creditors would then have been cut out. The continuing the works by new advances was the only hope of profits ever arising. The creditors had no right to the new creations and machinery. They had no right to the old, which *Belknap* might not have defeated by mortgage or absolute sale. What right, then, had creditors to the profits or proceeds of property, when they had none to the fund out of which they were to arise? And upon what principle can a reservation out of such profits, for an ample consideration in services to be rendered by the debtor, be held void?

But though there were a trust in favor of the debtor, the deed would not thereby be rendered void *in toto.* It would be void only *quo ad* the reservation. A court of equity will take the part reserved to the debtor. 2 *Johns. Ch.* 307. 4 *Johns. Ch.* 457. 6 *Bin.* 338. The last mentioned case has been referred to by the counsel for the plaintiff in error, for the purpose of showing, that a reservation in favor of the debtor renders the deed void *in toto.* We rely upon it to show that, in Pennsylvania, where the transaction is morally fair, the deed is void only as to the reservation. Compensation may be allowed to a debtor out of his estate. 15 *Johns. Rep.* 589. 20 *Johns. Rep.* 447. 4 *John. Ch.* 457. Parties may judge of it. 2 *John. Ch.* 316. But there must be no power of revocation, or future control over the property, inconsistent with the face of the deed. In this case none is pretended. 15 *Johns. Rep.* 583. 8 *Serg. & Rawle,* 450. 14 *Johns. Rep.* 483. Though an assignment be suspicious, it is not void. Chancery would set it aside only on payment of money due. 1 *John. Ch.* 483. A debtor may mortgage goods, and reserve a surplus to himself. 5 *D. & E.* 420. 2 *John. Ch.* 307. Mortgage is good; creditors may attach the surplus. 6 *Mass. Rep.* 343. Debtor may retain the use of property mortgaged. 3 *Cowan,* 138. In England the rule upon the subject of a resulting trust in favor of the debtor or his family is this: If the reservation is by covin, secret, and with design to defraud, the deed is void. If it is not covinous, but open and fair, the deed is good at law, and the whole legal estate is in the trustee. 5 *D. & E.* 420. 1 *Anst.* 381. The remedy of a creditor is in equity,

to reach the part reserved; because an execution at law will not reach an equitable interest. 2 *Johns. Ch.* 312; and the cases cited by the Chancellor, 4 *Johns. Ch.* 452. An assignment of a chose in action has never been held to be fraudulent, because no process in law or equity could touch it. *Rob. on Fr. Con.* 421–2. Apply these principles to the present case. The profits to accrue were not property. No creditor could take them. No profits had accrued at the time of the levy, and of course no creditor was or could be hindered, delayed or defrauded. In the case in 5 *D. & E.* 420, the reservation was of profits, and held fraudulent, neither in law or equity. In this case there is no covin. If the reservation makes the deed void, it is on principles of common law, and not by statute. It is a mere legal implied fraud, as against the policy of law or principles of equity. In such cases, a deed is voidable only so far as policy and reason go; and the residue is valid. 8 *Ves. Jr.* 283. 11 *Wheat.* 89, 90; and cases cited. When deed is void by statute, it is void *in toto.* This is the true distinction. All the cases where deeds are avoided, on account of resulting trusts, are cases where there was no consideration passing from the debtor. Here there was a valuable and honest consideration.

, In Pennsylvania there is no reason why a reservation for the benefit of the debtor should avoid a deed which is free from moral turpitude. Here all interest in property, real or personal, legal or equitable, except choses in action, can be taken in execution. A direct reservation of a trust, expressed in the deed, leaves the property open to legal process, and a creditor cannot be defrauded. He cannot even be delayed, for he is not compelled to resort to a court of equity; he can take the property by ejectment or execution. When the deed embraces notes, book accounts, or choses in action, and contains a trust in favor of the debtor, a creditor is not injured. His execution would not touch them; he could secure them only in case there was a bankrupt law applicable. They were as much out of his power before the assignment as after. The only remedy of the creditor in either case, would be a *ca. sa.* The debtor would not be released from imprisonment, until he should procure a re-assignment for the use of his creditors. There is no case which annuls an assignment, because it embraces choses in action, or other property, which a creditor could not take by legal process, and reserves them in trust for the debtor or his family. The *Stat. Eliz.* or the common law, never extended to such a case. If the present deed should be defeated, it would be subversive of the principle settled in 6 *Bin.* 338; and of a number of decisions in *New-York,* and in the Supreme Court of the *United States.* If the plaintiffs have been deceived and misdirected by these oracles of the law, they have been peculiarly unfortunate.

The next error assigned is, the charge of the court on the subject

of the retension of the personal property by *Belknap.* Upon
this subject the court below adopted the principle laid down in the
case of *Clow* v. *Wood,* 5 *Serg. & Rawle,* 275; and unless this
court are now determined to over-rule that decision, the charge
must be sustained. The retension of possession by the vendor is
not fraudulent, when it is accounted for and is consistent with the
face of the deed. 3 *Cranch,* 88--9. *Pr. Ch.* 285. 10 *Serg. &
Rawle,* 419--28. 1 *Johns. Ch.* 484. 1 *Peters. Sup. Ct. Rep.* 438,
449. So where the purpose is fair and honest, and appears on the face
of the deed. 1 *Wash. Va. Rep.* 184. 12 *Serg. & Rawle,* 201. 2
*Bos. & Pull.* 59. Where it is according to the usual course of bu-
siness; and where immediate possession cannot be given. 1 *Yeates,*
3. 1 *Attk.* 170--5. 7 *D. & E.* 71, 234. Or where all the posses-
sion is given, which the nature of the case admits of; or where pos-
session is to be after the performance of some condition. 1 *Cranch,*
317. 2 *H. Black.* 501. 1 *Attk.* 158, 232. Ready furnished lodg-
ings, *Coup.* 234. So goods of a friend purchased at sheriff's sale,
2 *Bos. & Pull.* 59. Possession by a banker or factor not fraudu-
lent. 1 *Bos. & Pull.* 84. 2 *Mass. Rep.* 398--400. 5 *D. & E.* 226-
7. Where no false credit is held out, possession not fraudulent. 1
*Johns. Rep.* 156. As where an executor or bankrupt remains in
possession; or a husband, of property settled under marriage arti-
cles. 3 *Burr.* 1369. 1 *Attk.* 101, 158. *Coup.* 432, 434, *note.*
So goods left with another to sell, or for safe keeping. 3 *Attk.* 44.
In order to make possession of a debtor fraudulent, he must have
possession in his own right. 8 *D. & E.* 82. 1 *Attk.* 158. If pos-
session is as agent, manager or trustee, not fraudulent. 7 *D. & E.*
67. 3 *D. & E.* 316. The true distinction is between absolute and
conditional sales. When sale is absolute, want of possession is
fraud *per se.* 1 *Cranch,* 316; but only in such cases. 3 *Cranch,*
89. 11 *Wheat.* 81 to 99, and note. The rule is well laid down in
*Clow & Woods;* and this case comes within it. Here the object of
the parties is disclosed in the agreement: it was fair and honest:
the retension of possession by assignor was part of the agreement:
it was highly useful to the establishment that he should do so. Ap-
pearances agreed with the real state of things—the manager—the
plaintiffs; owners, providers, buyers and sellers. Plaintiffs gave
public notice of the transfer to the hands. *Belknap* had or claim-
ed no possession in his own right. His possession was, according
to the agreement, a fiduciary one; and no one act was done by either
him or the plaintiffs, holding him out to the world, in any other
character than that which the agreement gave him. There is no
case in England, which calls these principles into question, where
it turns on either of the *Stat. of Eliz.* or the rules of the common
law. Cases of this kind must be carefully discriminated from those

(M'Clurg *v.* Lecky.)

which arise under the statute of bankruptcy. 21 *Jas. chap.* 19, *sec.* 11. 3 *Ruff.* 105--7; which makes special provision for the case of a bankrupt, who is in possession of goods by the compact of the owner, and is the reputed owner thereof. This section applies only to cases of bankruptcy in England. It is no part of the common law; but a mere statutory provision not in force in this country. The same remark applies to the cases quoted from *Massachusetts*, arising under their attachment laws, which are in the nature of bankrupt laws. 6 *Mass.* 342. 2 *Pick.* 135. So as to our domestic attachment laws. The English cases, and those under attachment laws, therefore, in which it may have been determined, that there was a reputed ownership, and therefore the property might be disposed of, according to the bankrupt or attachment laws, furnish no authority that they are cases of fraud under the statutes of *Eliz.* But where courts in England have decided that any case is not one of reputed ownership under their laws of bankruptcy, it is conclusive that it cannot be a case of fraud. Such cases are the highest authority in favor of the plaintiffs.

The opinion of the court was delivered by

ROGERS, J.—An insolvent debtor may, by a *bona fide* assignment of his estate, in trust, prefer one creditor to another, when there is no bankrupt, or other law, prohibiting such preference, so as not to interfere with any legal lien, binding on the property assigned. A debtor may also insert a condition in the assignment, that the creditors shall not be entitled to their order of preference; or he may exclude their claim altogether, unless within a given and reasonable time, they execute a release to the debtor. 1 *Bin.* 502, *Welt* and *Franklin.* 2 *Bin.* 174, *Lippencott* v. *Barker.* 6 *Bin.* 338, *McCallister* v. *Marshall.*

We are not without repeated efforts to extend the principle still further. In *McCallister* v. *Marshall,* 6 *Bin.* 344, the assignor made a reservation in favor of his family; but this attempt the court (although perfectly satisfied of the entire honesty of the transaction in other respects,) unanimously decided, avoided the assignment. The same point is ruled in *Passmore* v. *Eldridge,* 12 *Serg. & Rawle,* 201; in *Adlum* v. *Yard,* 1 *Rawle,* 163; and in *Johnson's Heirs* v. *Harvey,* 2 *Penn. Rep.* 92. In *McCallister* v. *Marshall,* a tacit agreement, to vest a part of the property in trustees for the benefit of the family, was held to avoid the conveyance, as to creditors, who had not assented to the arrangement. The statute of 13 *Elizabeth,* which avoids conveyances, with intent to delay, hinder or defraud creditors, would be of little service, if a debtor might put his estate beyond the reach of his creditors, and still derive an advantage from it. The rule, clearly deducible from the cases, is, that no debtor can, in an assignment, make a reservation at the expense of his creditors, of any part of his income or

(M'Clurg v. Lecky.)

property, for his own benefit; nor can he stipulate, for any advantage, either to himself or family. This restriction seems to me so necessary to set bounds to this species of transfer, that I am unwilling to countenance any arrangement which, in the smallest degree, interferes with it. We have, then, to inquire, whether the deeds, (for I take them all as an assignment,) contain a stipulation for the benefit of *Belknap* and family? and on this part of the case, I cannot bring my mind to doubt. It is part of the contract, that *Belknap* shall be employed as manager, or agent, for a compensation (of which he in the first instance is a judge,) sufficient to cover the expenses of himself and family. Nor does the agreement stop here. It is agreed, that on the death of *Belknap*, or in case he shall be prevented, either by sickness or other good cause, from managing or superintending the factory, then it is made the duty of *M'Clurg & Co.* and *Ekin & Ledlie*, to employ another agent, who shall be paid a reasonable salary, out of the one-third part of the annual profits allowed *Belknap*, for the purposes expressed in the assignment.

Athough the agreement is not very explicit as regards what may be a good cause for withholding his services from the creditors; or who are to judge of the amount of his compensation, himself, or the Trustees, yet we cannot fail to observe, the anxious care which is taken to secure employment for himself, and subsistence to those, whose welfare he had so much at heart. The import of the agreement, obviously is, that the family of *Belknap*, should at all events receive support, even in the contingency of any of the events, happening, which may make it necessary to employ another agent. The payment of the salary is to be entirely at the expense of the creditors; they are only entitled to the residue of the one third of the profits, after these necessary and indispensable expenses are paid. When we take into view, that at the time of the assignment, *Belknap* was insolvent, in connection with the fact, of the number, and amount of his debts, and that he, by the arrangement, secured to himself, I may say, a perpetual employment; together with a comfortable subsistence for himself, and the principal objects of his solicitude and care, even upon the contingency of his sickness or death, we cannot be at a loss to discover the reason of this extraordinary agreement. Extraordinary, I say, for without the pressure of these powerful and all prevailing motives, it is difficult to imagine, any satisfactory reason, which could induce *Belknap* to make a contract, which is in every respect, so advantageous to the assignees. We cannot but suspect that the stipulations in favor of the debtor were the moving cause, the *sine qua non*, of the contract. Without these, to him indispensable stipulations, who can say that this contract would, ever have been made? Is not the probability altogether on the

(M'Clurg *v.* Lecky.)

side of the plaintiffs in error, who maintain that these considerations, were the main springs of the assignment. If this arrangement be sustained, then, a powerful inducement will be afforded to such unjust, because unequal, preferences in future, introducing in its train, as I verily believe, a fruitful source of litigation and fraud. The cases which have been cited would seem to cover the whole ground, differing merely, in the superadded circumstance, that the debtor agrees to give his services to the assignees as a consideration for the benefit secured in the assignment. On this the defendant in error relies, but the agreement loses all its plausibility, when we remember, that the same compensation continues, although *Belknap* may be unable from any of the causes enumerated in the assignment, to afford the services, for which these benefits are said to be the equivalent. It is another device, and ingenuity will furnish many such, if we yield to this, to elude the statute which prohibits covin and fraud. I shall not dwell on the argument, that *Belknap* constitutes himself his own trustee, as perhaps there may be some doubt, whether this be the fair construction of the agreement. It may be entitled to some weight, that the compensation is left uncertain and undetermined. The creditors might reasonably expect something more definite, which would serve as a guard against any combination between the trustees and the insolvent. If this assignment should be sustained, we have reason to fear that those creditors will be preferred, who will give the most facilities to the debtor, and when it is recollected that friends are usually selected, we cannot but perceive, how much the interest of creditors are endangered. It is not uncharitable to suspect liberality exercised at the expense of others. But it is said that the jury have negatived all idea of actual fraud; and this is true; but the answer readily suggests itself; that such arrangements are prohibited, because they are conceived to be against the policy of the law, which discountenances all assignments containing any such reservations, whether in the shape of employment or otherwise. These rules have been adopted, and I am glad to say, have been strictly adhered to in Pennsylvania, to prevent the temptation to fraud. However innocent the particular transaction may be (and I am bound to believe, that this was a case of that description, after the verdict of the jury) yet it is dangerous in its consequences to society, and would furnish a precedent, a prolific parent of numberless attempts to elude the operations of the statute. In vain, will you attempt to set bounds to the enjoyment which an insolvent and fraudulent debtor may derive from the wreck of his fortune, if, after he is irretrievably ruined, he may effect an arrangement, which secures to himself a lucrative employment, attended, as it is here, with a comfortable provision for those who are most dear to him, insured against acci-

(M'Clurg *v.* Lecky.)

dent; and this so dexterously managed, as to be proof against any molestation either by execution against his property or his person. It is no answer, I say, that the jury may apply the corrective, where there is actual fraud. Those who are conversant with the proceedings of a court of justice know full well, how difficult it is to prove fraud. We are all well aware how reluctant juries are, even where there is strong circumstantial proof, to infer the fraudulent intent in the case of an unfortunate, and in some respects, meritorious debtor. If the feelings and sympathies of juries can be enlisted on the side of misfortune, it presents an almost impassable barrier to a correct and proper decision. I would not wish to be understood to say that the policy of the law forbids the employment of the debtor; for this may not only be an act of humanity, but in some cases, may be almost indispensable, to the proper management of the estate. I mean simply to object to its being made a condition of the assignment. It should be left, as in the case of others, to the sound discretion of the trustees, who will of course be answerable to the creditors for any abuse of the trust. If this attempt should succeed, the creditors are without remedy; for as was justly observed in *Johnson's heirs* v. *Harvey*, the ordinary consideration of an estate may be subjected to execution specifically, or wrested from the debtor's grasp by execution of his body; but the reservation, of so much of the profits as was necessary for the maintenance of *Belknap*, and his family, would be so inseparable from his person and the services he was to render, as that it could not be made liable in satisfaction in either of those ways, or pass by an assignment under the insolvent laws. And this would be a sufficient answer, if there were none other, to another point made by the defendant in error. That even if the assignment be fraudulent, it avoids the deed only so far as to enable the creditor to take into execution the fund specifically applied to the benefit of the debtor. But, although such a reservation in the absence of moral fraud, has, in some of the earlier cases, been supposed, not to affect the residue of the property conveyed by the assignment, yet later, and more wholesome decisions, have extended the principle still further, by rendering fraudulent and void the whole assignment, so as to prevent the preferred creditor from availing himself of any advantage over other creditors. 1 *Hop.* 373, *Marlin* v. *Cairns. Harris* v. *Summar*, 5 *Cowen*, 547, 2 *Pick.* 120, and *Passmore* v. *Eldridge*, 12 *Serg. & Rawle*, 198. When the assignment is tainted with either moral or legal fraud, the property does not pass, but remains in the debtor, liable to the execution of those creditors who have not assented to the assignment. These positions I consider it necessary to uphold, as affording the only check to the debtor's power of assignment, which has already, in my judgment, been carried too far; for as was

(M'Clurg *v.* Lecky.)

justly remarked in *Riggs* v. *Murray,* if an insolvent debtor may make sweeping dispositions of his property, to select and favorite creditors, yet loaded with durable and beneficial provisions for the benefit of himself, and incumbered with onerous and arbitrary conditions and penalties, it would be impossible for courts of justice to uphold credit, or to exact the punctual performance of contracts.

The opinion of the court 'makes it unnecessary to consider the second point made by the plaintiff in error.

Judgment reversed.