In the matter of the Accounts of WILSON, Assignee o KNOX, BOGGS and Co., Exceptions to Auditor's Report.

A general assignment by two partners, stipulating for a release to themselves, and a third partner, is fraudulent on its face, though the non-executing partner has no estate, but such as passed to the assignee.

A., B. and C., partners in trade being unable to pay their debts, and C. being absent, A. and B. executed an assignment purporting to be a conveyance by A., B., and C. by his attorney, of all the joint and separate estate of the firm, and of the individual members, in trust for certain preferred creditors, and then for creditors generally, with a stipulation that such creditors should not be entitled unless, within three months, being residents, and within nine months, if non-residents, they executed a general release to A., B. and C. On proof being taken, it appeared that C., the non-joining partner, had no private property except a pew which was included in the schedule annexed to the deed; and the proceeds of which were received by the assignee, and distributed. Two months before the expiration of the period for creditors to come in, C. executed a power of attorney, authorizing the execution of any assignment of the partnership assets for creditors, and ratifying any that had already been made. Creditors to a large amount released according to the condition. C. subsequently acted for the assignee under a power of attorney. *Held*, that the instrument was fraudulent on its face for the want of a conveyance of C.'s separate property; that it was not supported by the consideration of the releases, as those creditors had notice of the defect; that the insolvent trustee of A. and B., and bankrupt assignee of C. was entitled to recover the cash in the hands of the voluntary assignee, and the unadministered assets.

The assignment having been executed in May, 1837, the insolvent trustee, who has the rights of an execution-creditor, having been substituted in 1842 for those not acting on a discharge of two of the partners in 1837, and also appointed assignee in bankruptcy in April, 1844, under a discharge of the third partner in 1842, claiming adversely to the assignment in June, 1843, and April, 1844, is not barred by laches or the statute of limitations, as to funds then in the hands of the fraudulent assignee.

And he may also claim a dividend awarded to a releasing-creditor under a former auditor's report, confirmed by the Common Pleas, which had not been actually paid over.

The assignee when before the auditor of the Common Pleas on his accounts, may elect to pay to an adverse claimant; and if such claimant have the right, there can be no objection to the jurisdiction.

For payments made to his *cestui que trusts* before an adverse claim by the insolvent trustee and bankrupt assignee, the voluntary assignee is protected.

*Jan.* 11, 13, 14, 15, 16. This case was brought into this court by appeal from the decree of the Court of Common Pleas of Philadelphia. After argument, the case was referred to an auditor. The reasons, therefore, and the instructions to the auditor appear in Okie's Appeal, 9 Watts & Serg. 156. The present argument was on exceptions to the report of the auditor. The facts of the case, as they were presented in the argument, were these. The assignment on which the case turned, purported to be an "indenture made May 10, 1837, between John Knox and wife, James Boggs and wife, and James A. Knox; the said James being now absent, and acting by his attorney duly constituted of the one part, and William Wilson, and David Knox of the other part," reciting that said John and James, lately trading as Knox and Boggs, and said John, James and James A. lately trading as Knox, Boggs & Co., were indebted to several persons therein-after mentioned, and were unable from losses to pay their engagements, and were desirous of making a just distribution; in order to effect which, the said J. K. and wife, J. B. and wife, and J. A. K., granted, &c. to the assignees, their heirs, executors, &c., "all the estates, joint and separate, real, personal, and mixed, of the said J. K. and wife, J. B. and wife, and J. A. K., viz., all their real estates, stock, &c., choses in action, and other personal and partnership property of every name and description, whether held or standing in the names of said J. K., J. B., or J. A. K. jointly, or in common, or in the names of any or either of them, or of either of said firms;" a schedule whereof, as fully as could then be made out, being attached and made part of the indenture, together with all the estate of the said parties of the first part, &c. : in trust to pay out of the proceeds of the separate estates thereby assigned or intended so to be—1. the expenses of the trust; 2. the "debts due by J. K., J. B., and J. A. K. respectively for house rent, household and family expenses, and servant's wages;" 3. out of the residue of the joint and separate estates to pay the creditors of K. and B. or K. B. & Co. mentioned in schedule B, class No. 1; then class No. 2; then class No. 3; then class No. 4. Then, after full satisfaction of these, to pay creditors generally, whether partnership or separate, "provided that no person in this last clause referred to shall be entitled to demand any dividend from the assignee by virtue of said clause, unless, if

resident within the United States within three months, and if out of the United States within nine months, he or they execute and deliver in favour of the said J. K., J. B., and J. A. K., and each of them and of their executors and administrators, a full and absolute release of all claims, &c., upon said J. K., J. B., and J. A. K., reserving, if need be, their rights on any other person;" and provided that in no case should the joint or separate estates of either of the partners be applied to the payment of the debts of the other partners for which such partners were not liable.

The residue, if any, after settlement of all debts, principal and interest, as above directed, was reserved to the grantors according to their respective rights.

The deed was executed and acknowledged on the day of its date, by J. K. and wife, and J. B. and wife, and two additional seals were attached without signatures.

The trust was accepted.

Schedule A contained a description of several pieces of real estate belonging to James Boggs, and to John Knox; also a pew of J. K. in —— church, one of J. B. in the same; *one of J. A. K. in the same*, and some other private property of J. K., and J. B., and debts due the firm, stock, and real estate, amounting to $637,750 08.   Other property was also mentioned, immaterial to the present case.   On the 2d of June, J. A. Knox wrote from Nashville, in reply to a letter from Philadelphia, enclosing a power of attorney, saying he had just arrived, and hoped it would be in time.   On the 3d, he again wrote to John Knox referring to the power of attorney sent the day before, and saying though he knew it would not arrive in time, he hoped it would not be attended with serious consequences; "I feel much relieved since I have examined the papers, to find all has been given up."

The power was executed the 2d of June by J. A. K. empowering John Knox to sign and deliver "in my name any deed, &c., conveying, &c., to any person, &c., all my interest, &c., in and to all the property, &c., belonging to the firm of Knox, Boggs & Co., it being my intent by these presents, to empower my said attorney in my behalf, to join my co-partners in executing any instrument" or assignment of the estate of Knox, Boggs & Co. for the benefit of said creditors in such manner as they thought proper; "and should my co-partners or either of them in our firm's name, have heretofore executed any such instrument," &c., he thereby ratified the same; "and I do hereby ratify all acts, deeds, assignments, &c., to whomsoever

made, or to whomsoever they may hereafter be made by my said attorney, in virtue of and in pursuance of these presents."

Creditors to the amount of $123,370, released according to the condition of the assignment.

In 1838–9, J. A. Knox, acting for the assignees, under a letter of attorney, dated May 12th, 1837, they being by the assignment authorized to appoint attorneys, collected and remitted many thousands of dollars from the debts due the firm.

A deed for a pew in the church was shown, whereby it appeared that the grantee had paid $225 for the same, and held it in fee. Also a conveyance by said grantee to another, for $200.

The constitution of the church was, that pews were held subject to such yearly rents, restrictions, and regulations, as the board of trustees may lawfully enact, with a right to them, in default of payment of the rent, to sell, paying the surplus to the owner.

J. A. Knox's account of personal estate in the assignee's books, showed a *debit* by cash $268. Credit by property assigned, $268.

It was also proved that the pew of J. A. K. was worth from $400 to $600.

The parties claiming under the assignment, gave evidence that J. A. K. resided in his brother's family; had been employed as a boy in the store, and when taken into the firm, put in no capital. Witness had been very intimate with him from boyhood, and knew of no separate property, and no source from whence he could have obtained money.

In September, 1837, J. K., and J. B., on their several petitions, were discharged as insolvents in Philadelphia; the two largest creditors being named trustees of J. K., but never acting. No trustees were appointed for J. B., his assignment having been left blank. Okie was appointed trustee for both parties, May 28th, 1842.

In 1842, J. A. K. was discharged as a bankrupt in Louisiana, and Okie appointed assignee April 5, 1844.

On the 4th February, 1842, the auditor held a meeting on the 5th general account of the voluntary assignees, and was attended by the assignees and releasing creditors.

In order to have a fair statement of the whole estate made out, these proceedings were suspended for a time; during this delay, no one having appeared before the auditor to contest the assignment, the assignee declared and paid a further dividend of nine per cent. to the releasing creditors, which amounted to $9869. The assignee then filed his sixth account, in which he claimed credits for these

payments. Of the balance then remaining in the hands of the assignee, there was $3138 70 dividends declared in favour of creditors under former accounts, confirmed by the court, which had not been paid over, but were kept on deposit in the general bank account. Among these were Sheepshanks and Gray, who were exceptants and heard in the present argument. This having been referred to the same auditor, the matter was again suspended for the reason given above.

On the 27th June, 1843, he again held a meeting, and Okie claiming as insolvent trustee of J. K., and J. B. appeared and claimed the whole fund received by Wilson, on the ground of the invalidity of the assignment.

On the 18th April, 1844, the claim was again renewed in the additional capacity of bankrupt assignee of J. A. K.

A bill of interpleader having been filed by the assignee, it was agreed on the 16th October, 1844, between himself and Okie as trustee and assignee in bankruptcy, that the bill should be withdrawn, and no objection taken to the claim by Okie before the auditor, on account of want of jurisdiction in the court or auditor; that the credits for the $9689, dividends actually paid before Okie's appointment, should be allowed, and that the assets remaining, if finally decreed to be paid over, should remain in Okie's hands, subject to the lien of attachments laid on them in the hands of Wilson.

For the purpose of showing proceedings by non-releasing creditors against the assignment, Okie gave in evidence records of attachments in execution by McKee, Hennessey, and several others, in 1839, 1841, and 1844, and also an action commenced by Okie as assignee and trustee against Wilson, in June, 1844.

On this state of the facts, the auditor awarded to "Okie, trustee, &c.," the balance of cash in the hands of Wilson, including unpaid dividends on the former accounts, and the specific funds held by him, subject to the attachments laid on the bank of deposit.

This report having been confirmed, Wilson appealed, as has been stated, to this court, who referred it again to an auditor. Before him, Wilson claimed to pay over the funds in hand to Okie, and the releasing and preferred creditors objected. The new evidence given before this auditor was merely to show that a watch which had been purchased by J. A. K. shortly before the assignment, was purchased for a friend in the west. On the report of the auditor, awarding the unpaid balance, and the residue of the assets to "Okie, trustee of Knox, Boggs, & Co., appointed under their petition in

insolvency," exceptions were filed by the releasing and preferred creditors:

1. Because the auditor exceeded his authority in reporting the fund invested, and the residue of the assets to the insolvent assignee.

2. Because he erred in deciding against the validity of the assignment, and the confirmation by J. A. K.

3. In not deciding that Okie and the non-releasing creditors had lost their rights by laches.

4. In making the same report as was made by the former auditor, which was set aside by this court.

5. Because he erred in deciding on facts which should have been decided at law.

*Price*, for Sheepshanks and the releasing creditors generally.— There is but one objection to this assignment: the omission of J. A. Knox's seal; if that were there no question could arise. We undertake to show an equivalent—first disposing of the question of the unpaid dividends. These were awarded by an auditor, and the account confirmed by the Common Pleas in 1841, before any adverse claim was set up. That decree remains unaffected, not having been appealed from, and is in full force at this time. Under the act of 1836, (assignees,) §§ 28 and 36, it is conclusive, and all matters therein decided upon are closed for ever; certainly as to collateral proceedings. This, by § 33, is of equal effect with a decree of the Orphans' Court, and therefore enforceable by attachment; nor could Wilson, in any future proceeding thereon, set up any defence. In Dyott's Estate, 2 Watts & Serg. 557, and Okie's Appeal, 9 Watts & Serg. 176, it was held, that the fact that no exceptions were filed to the report, prevented the parties from ever objecting. Gray *v.* Bell, 4 Watts, 411, impliedly decides this question.

On the main question. We contend the assignment is valid: 1. Because the alleged defect was cured by the ratification of J. A. K., and 2d. it was purged by an actual surrender of all his private estate. That if voidable, it cannot be avoided to the prejudice of releasing creditors, because they have acquired rights as purchasers for value before there was any election to avoid it; because the non-releasing creditors, and their representative Okie, are estopped by supineness; and have no superior equity which is essential to obtain the aid of the court in favour of a particular creditor. That the present complainant is barred by the statute of limitations; and lastly, that in this proceeding he cannot recover, though Wilson has no right to hold for his *cestuis que trust*.

The ratification. The deed purports to pass J. A. K.'s private estate. Two months before the creditors were called upon to release, he affirmed the deed by the letters of the 2d and 3d of June, and the power of attorney, and he would be for ever estopped by acting as he did, under a power derived from the assignee. The releasing creditors, if they had notice of the defect in the instrument, had also notice of these acts of ratification, and might have acted on the faith of them. It is well settled, that a ratification of an act in the name of another, without his authority, relates to the date of the act itself; Story on Agency, § 242; nor according to modern cases there cited, is it necessary that the ratification should be under seal, § 244. [ROGERS, J.—Does the power authorize the transfer of the private estate?] I think it does : the first clause having given every possible power as to the partnership effects, the latter was intended to cover any other acts which might by chance be required. [ROGERS, J.— Must we not construe that by reference to the "above clause?"] That would run counter to the rule that every word must have effect. [Per Cur.—Such a construction would generally produce mischief.] The party himself has put his own construction on it, by acting under the deed conveying his property. That such acts may be thus ratified, is settled in Pearpoint v. Graham, 4 Wash. C. C. Rep. 232, and it is there said the general creditors cannot object. That a sealed instrument may be subsequently ratified by parol is well settled. Gram v. Seton, 1 Hall, 262, which has received the sanction of this court. Cady v. Shepherd, 11 Pick. 400 ; Bond v. Aitkin, 6 Watts & Serg. 165 ; Darst v. Roth, 4 Wash. C. C. Rep. 471. It was well recorded, for the acknowledgment by one grantor is sufficient, §§ 2 and 17 of the act ; and there may be a subsequent perfecting of the deed as by delivery, Harrison v. Trustees, 12 Mass. 461. If there be a presumption of property as has been said, that cannot be extended beyond personalty, and as to that, the authority to assign need not be in writing, though the assignment must, by implication, from the necessity of recording. Story on Agency, § 50.

The only private estate proved in the case was the pew, and that is not an article of property within the rule of law—[ROGERS, J.—I think that was the opinion of a majority of the court,]—it was worthless, being subject to any amount of rent the trustees chose to place on it. We have, moreover, shown it went into the account ; the proceeds are credited. In Thomas v. Jenks, 5 Rawle, 221, the existence of other property was established under a commission from this court, and in Fassit v. Phillips, 4 Whart. 409, the omission of property valueless by reason of encumbrances was decided to be imma-

terial. There are many cases of contested assignments in which that feature appeared, and this is strong evidence of the understanding of the profession; they are in 5 Watts & Serg. 145; 10 Watts, 309, and others.

But the rights of releasing creditors cannot be affected. The fund now in question did pass by admitted competent authority, and at most, the deed being voidable, and no attempt to avoid it having been made until 1844, intervening rights are saved. Creditors only could do this, and until Okie became bankrupt assignee of the last partner, he could not act in their rights. As trustee of the partners his right was to their surplus. During this delay, the acts permitted by the creditors cured the defect. The releasing creditors electing to come in, gave up all other claims; the non-releasing took their chance of future assets, and by this *ex post facto* consideration the assignment is supported; Adlum *v.* Yard, 1 Rawle, 163; Pearpoint *v.* Graham, *ut sup.;* Petrie *v.* Clark, 11 Serg. & Rawle, 377; for being voidable only for constructive fraud a purchase cured it, and these creditors are purchasers; Coe *v.* Hutton, 1 Serg. & Rawle, 398; it is an accord and satisfaction; Watkinson *v.* Inglesby, 5 Johns. 386; Hatch *v.* Smith, 5 Mass. 42, 50; Twelves *v.* Williams, 3 Whart. 494; 10 Watts, 312; Andrews *v.* Ludlow, 5 Pick. 28. A different view from that of our courts as to the effect of an omission, not a reservation, of part of the property is taken in Canal *v.* Cox, 6 Greenl. 395, and the reasoning appears in Angel on Assignments, 119—137. [GIBSON, C. J.—The condition is, you give up a part if you get the rest; that bears fraud on its face. The creditor is put to his election, and that for the very purpose of securing a part of the debtor's estate to himself.] The authorities show that these creditors having given value, the deed cannot be avoided under the statute. Sterry *v.* Arden, 1 Johns. Ch. Rep. 261; S. C. 12 Johns. 536; Daubeny *v.* Cockburn, 1 Meriv. 638, 643. [ROGERS, J.—Our cases are that a creditor not coming in may treat the deed as not existing.]

Laches. This case is in Chancery, and equity must be done to entitle complainants to equity; there must be vigilance to prevent others being injured. [ROGERS, J.—To whom were they to give notice?] They might have filed a creditors' bill, or taken out executions. This principle has been acted upon in Stewart *v.* McMinn, 5 Watts & Serg. 100, and in Okie's Appeal. The debtors paying the assignee, and the assignee paying dividends, are protected in acts done before hostile proceedings, and why not creditors releasing their debts, three months having elapsed without any movement? This was applied in Thomas *v.* Goodwin, 12 Mass. 140, in the case of an

assignment palpably fraudulent. In Bradford *v.* Tappan, 11 Pick. 76, the court considered the releasing creditors as having acquired liens at the date of their release, the assignment being set aside. Wright *v.* Stanard, 2 Brock, 311. [ROGERS, J.—Are not these cases in which the defect did not appear on the face of the deed? GIBSON, C. J.— If notice affects them, of course it opens the whole case, even as to what has been paid over.] And you have protected them thus far.

What notice had they that a seal was wanting? and the presumption is, they had notice of the ratification. The conflicting decisions preclude a decision that they, laymen, were bound to decide. The assignee had equal notice, and he is protected because he had parted with the fund. So we with our rights. In accordance with these cases, it is said in Wakeman *v.* Grover, 4 Paige, 23—42, that until a *lien is fixed* the assignment is valid.

They must show a better equity. This is a first principle of equity; we are equally creditors; are in possession, and prior in time. Story's Eq. §§ 59, 381—434, on such a point is referred to, authorities not being required; it was applied in Beach *v.* Viles, 2 Peters, 675, where, there being merely constructive fraud, the assignee retained for his own debt.

Can Okie claim? He claims as insolvent trustee, and as such only the auditor awarded to him. His rights in this character are under the § 36, act 1836. This contemplates actual fraud, not constructive, under 13 Eliz. There is no actual fraud pretended here, it is rather a case of mistake or accident, in which equity would relieve. He was insolvent assignee of the partners on separate petitions, and as such only deals with separate interests—the resulting use; here the funds are of the partnership. Taylor *v.* Fields, 4 Ves. 396; 2 Johns. 282; 4 Yeates, 478; 1 Gall. 367; Doner *v.* Stauffer, 1 Penna. Rep. 198. In the latter case the separate interests of all the partners were sold under execution, and the purchaser was held to take, subject to the claims of the joint creditors. Okie, therefore, at this time represented the separate interests only, or for the first time that of the firm, in 1844, under the bankrupt law, as assignee of the surviving partner, which J. A. K. was in contemplation of law. Under the bankrupt law he has no right, for that has no effect on acts done prior to its passage. Weiner *v.* Farnum, 2 Barr, 146. The act alone gives the assignee any such authority, and refers only to frauds against its provisions—acts done in contemplation of bankruptcy; as to other matters, he is under the common law. By that the assignee succeeds to the rights of the assignor, and he being

estopped, so is the assignee. Seal v. Duffy, antè, 274. The same was ruled in Vandyke v. Christ, 7 Watts & Serg. 373. [ROGERS, J. —That was a voluntary assignment. An assignee by operation of law is in the situation of creditors having judgments and executions.] That is so under the insolvent law, which has been disposed of; but by the bankrupt law no such rights or powers are given.

· Statute of limitations. This is fixed by the bankrupt law at two years after the decree, and this elapsed before the appearance before the auditor, and that was nothing, for this court turned him out. [ROGERS, J.—What is an adverse interest within the act?] We know what it is in ejectment, and here we are in possession and claim to exercise ownership. [ROGERS, J.—No; you only claim to collect and pay debts.] Wilson is our trustee; his acts are ours; we have been selling, collecting, paying, and filing accounts, and they claim under this act that which we, for more than nine years, have considered and treated as our own. But we are protected under the statute. There is sometimes a question whether equity will adopt it. In May, 1837, we acquired title; from thence until June, 1843, there was nothing to suspend the statute, nor was that appearance of any effect then, under the decision of this court: during the nine years which have elapsed, some of the actions mentioned in the act might have been brought. Story's Eq. § 529.; Elmendorf v. Taylor, 10 Wheat. 172; Miller v. McIntyre, 6 Peters, 66. There is no trust here between Wilson and the complainant, it was under the deed for the persons therein provided for, and any one of them may plead the statute. 1 Rus. & Myl. 349. Clearly, then, Okie cannot recover in this proceeding.

C. Fallon, contrà.—There are no funds in question in this case but those received by Wilson from the estate of K., B. & Co., and by him claimed to be paid over to us. These were received within four years of this time. Assuming him to be a trustee under the assignment, is he justified in asking to pay it to Okie? That is the question. Is there, can there be any doubt about it after the decision in Okie's Appeal?

When originally before the auditor we construed Dyott's Appeal, to vest the jurisdiction in that court, and by that form of proceeding; but being anxious to terminate litigation, the agreement was made to give the jurisdiction. Wilson received a consideration in being protected in his distribution of $9000, without the sanction of a decree, and Okie confirmed this in consideration of waiving the objection on account of jurisdiction. We never did desire to compel

Wilson to refund ; but appeared to give a right of action against those receiving *malâ fide*, under the pretence of being creditors. We do not desire to hold him liable for any thing paid before our rights accrued.

Have we a standing here? This court did say in Okie's Appeal that Wilson might elect to pay to us. This court, in Hennessey *v.* The West. Bank, did decide that this assignment was, under the 13 Eliz., utterly null and void, for matters which were on the face of the instrument, which could not be amended by any matter. So in Missouri. It is also settled in Englebert *v.* Blanjot, 2 Whart. 240, that the insolvent trustee could recover from the assignee, or under a fraudulent assignment. Okie held that office, and subsequently that of assignee in bankruptcy. If Hennessey *v.* The West. Bank needed support, it would be found in this, that though this deed purports to pass partnership assets, it is not executed in the name of the firm. But what was that decision? it was that the creditors called upon to release were not required to inquire whether the non-executing partner had assets or not. The risk was not to be put on them. It would open the widest door to collusion and fraud. The assignor would retain the power to destroy the assignment, or uphold it at his pleasure by communicating to non-releasing creditors the fact that property was omitted, and thus having obtained a discharge, deprive the releasing creditors of the consideration therefor. Nor is there any fact to be tried here. The assignment does not purport to convey J. A. K.'s private estate, being unexecuted by him.

It is said Hennessey *v.* The West. Bank is new law. The principle is found in McClurg *v.* Lecky, 3 Penna. Rep. 83, 93 ; the reservation of any benefit avoids the whole conveyance. In Johnston *v.* Harvy, 2 Penna. Rep. 92, a probability of such a fact was considered sufficient to put purchasers on their guard. Here the instrument speaks of J. A. K.'s separate estate, and makes provision for the payment of his debts out of it. In Thomas *v.* Jenks the fact of separate property appeared affirmatively, but the case is not put on that, but on the unlawful imposition of a choice which may prove unfortunate. So in Passmore *v.* Eldridge, 12 Serg. & Rawle, 201, it was held, creditors are not bound to inquire whether a vague description was intended to carry specific property.

Nor will the releases avail the creditors; the deed is void *in toto*, and cannot support any thing. McKee *v.* Gilchrist, 3 Watts, 230. [BELL, J.—There appears to have been actual fraud there.] Seaving *v.* Brinkerhoff, 5 Johns. Ch. Rep. 330, was similar to this, and there was no actual fraud and no evidence of other property. Aus-

tin *v.* Bell, 20 Johns. 442 ; Hyslop *v.* Clarke, 14 Johns. 465 ; Mackie *v.* Cairns, 5 Cow. 580, show that the existence of releasing creditors is an immaterial fact. Nor is there any distinction between legal and actual fraud. Thompson *v.* Lee, 3 Watts & Serg. 480. The statute avoids for either equally. Seal *v.* Duffy shows that it was a mistake, in Englebert *v.* Blanjot, to consider the non-recording a fraud. It is a singular fact, that the only case in the books, apart from Hennessey *v.* The West. Bank, where releases were demanded and all the property passed, is Burd *v.* Fitzsimmons, 4 Dall. 76, and it was there held to avoid the instrument. In Thomas *v.* Jenks it was assumed that Lippincott *v.* Barker, 2 Binn. 174, had decided the contrary, and that releases might be stipulated for. But there the releases were executed at the time of the assignment. Fassit *v.* Phillips, so far as it goes, is against us ; but there the question was simply on the dissolution of an injunction on an answer denying the facts set out in the bill. There is yet another ground here ; a release of J. A. K., not a party, is demanded as a condition precedent to the right of reaching the assets. If affirmative evidence of property is required, it is in the case. There was a pew, it brought money, and it is decided to be property for creditors. Wakeman *v.* Grover, cited on the other side ; 3 Kent's Com. 402 ; 10 Mass. 323 ; 16 Wend. 28, 32 ; 5 Met. 127. Nor is there any ratification by the power of attorney. It would not be construed to allow a conveyance of the private estate by any rule heretofore known. Nor has the attorney done any act under its authority. He has not pretended to execute the deed for J. A. Knox. It is well settled that the power must be executed in the name of the principal. The signature or mode of execution determines the question whether it be the act of the principal, or the private act of the attorney. Heffernan *v.* Adams, 7 Watts, 121 ; 2 Watts, 83 ; Meyer *v.* Barker, 6 Binn. 228 ; Peters *v.* Condron, 2 Serg. & Rawle, 80. The instrument must be a recordable one ; for without this, there would be a power reserved to every creditor to avoid it at his pleasure. Nor was it ratified by the letters ; they do not go beyond the power of attorney. Nor had the writer the acts already done in his mind at the time. Even if so, creditors are not to be put to this.

A subsequent parol ratification of an act under seal is insufficient. 14 Serg. & Rawle, 331 ; 9 Wend. 56, 68 ; 20 Wend. 251. The true doctrine is in 4 Dall., that stipulations for a release are fraudulent. [Rogers, J.—It is not necessary to argue that ; it is too late to retrace our steps.] But the true ground of objection was not taken before ; the deed does not pass the partnership assets. The partner

can do so merely as agent of the firm; and to bind it he must execute in the name of the firm. Story on Agency, § 147—149; Clarke v. Courtney, 5 Pet. 319, 320; 4 McCord, 534; 6 Watts & Serg. 165; Moddewell v. Keever, 8 Watts & Serg. 63. No cases support the rights of releasing creditors as contended for, they are embraced in three classes of cases. 1. An outstanding secret equity. 2. A secret fraud in the assignor. 3. Where there is fraud on the face of the instrument. In the last class of cases is Thomas v. Jenks, and the present; and without this, Knowles v. Lord, 4 Whart. 500, settles that such creditors cannot claim to be purchasers. Nor are they purchasers without notice: Johnston v. Harvy. [GIBSON, C. J.— They had no more notice than the assignee already protected, because he had no notice that creditors would avoid it: So of the creditors.] The assignee is protected, because he must go on under his trust until he is stopped. Reed v. Dickey, 2 Watts, 465; Chew v. Barnett, 11 Serg. & Rawle, 392; Rogers v. Hall, 4 Watts, 359. We did elect to avoid the first moment we possessed the power. But another ground is contended for on the authority of Beach v. Viles. [*Per Curiam.*—We have recognised the same doctrine; as in the case of an administrator paying more than a rateable dividend; if *bonâ fide*, it cannot be recovered back.] We do not seek to affect any payment so far as Wilson is concerned, but a creditor obliged to set up a fraudulent assignment cannot even retain for his debt. 4 Johns. 596. If the release was obtained by fraud, it would be void. If with notice, it is their choice. Okie's right to take advantage of this fraud is settled. [C. J. You need not argue that: he has the same right as an execution creditor.]

Is he such an assignee as may take advantage of this fraud? If there be an assignee of one partner, and the other is out of the jurisdiction, or insolvent, such assignee may recover for distribution. Ayer v. Brastow, 5 Law Rep. 501. All these facts occur here. So that if he only represents the interests of two partners, he may recover. Barker v. Goodair, 11 Ves. 85 ; Smith v. Stokes, 1 E. 363. But now uniting the interest of all, he represents all, and therefore the partnership. Doner v. Stauffer, 1 Penn. 203. Story on Partnership, 442, 444.

Laches. There was no one appointed until 1842; those named refused. Within twenty years the right is perfect against the assignor. Power v. Hollman, 2 Watts, 218, and consequently against volunteers. If there can be a confirmation, it requires a valuable consideration, and then the deed is confirmed only as to the

party receiving the consideration. Adlum *v.* Yard, *ut sup.* ; Chamberlain *v.* McClurg, 8 Watts & Serg. 31. The money now claimed is out of this question, not having been received until within a few months. Nor can a trustee, *ex maleficio*, set up any thing but confirmation. Story's Eq. § 1265. (On the statute of limitations the court refused to hear argument.)

As to Sheepshanks' claim, the money was not his specifically ; it was kept as a general balance, not separated in any way. The decree is reversed, for the court below permitted us to appear and claim this very fund, and affirmed the award in our favour. [On the subject of the execution of the deed, Mr. Price here cited, 2 Black. Com. 306, that signing is not essential, and that the execution was properly by each partner separately. Perk. §§ 117, 134 ; 13 Vin. *Faits*, H. 2 ; 3 Lev. 1 ; 2 Stra. 764 ; Touch. 56 ; Regina *v.* Goddard, 3 Salk. 171 ; 2 Raym. 920 ; Comb. 477 ; 2 Salk. 462. An agreement by a party to the indenture makes him liable on the covenants, Com. Dig. *Fait*, A. 2, C. 2 ; Co. Litt. 231 *a*.

*J. M. Scott.*—The exceptants are claiming contrary to the rule that equality is equity; and their right is founded on a nominal consideration merely, as their releasees were insolvents. If the assignment is fraudulent, they are parties; if they are not parties to the fraud, their releases are void.

The first exception is counter to their own agreement, as well as to the decision of this court. That was made by the legal owner, the authorized agent of the releasing creditors, and was binding on them until he was removed by them.

The second is but the curtain behind which they seek to review Hennessey *v.* The West. Bank. That case was but carrying out the principles of the 13 Eliz., and it is most important to sustain it, there being no other remedy. The facts for the first time appeared for the application of the rule. One partner's entire interest was excluded. If this is allowable, but one partner need act, and all the others will be free. The deed is grossly defective on its face; it falsely recites that a party joins in it who never did, and it claims to assign property which never passed. No one of these creditors would have been satisfied to purchase a house by such a deed, so manifestly incomplete. Nor is the decision in conflict with Fassit *v.* Phillips; that was an interlocutory order, the question on the deed being reserved for final decree. There is no pretence of ratification by the power, for no such act as is therein referred to had been done. Nor would a ratification after registry be sufficient. The object of the

act was to suppress fraud, to enable creditors to have the instrument before them, and to judge by inspection of its merits.

3. Laches. This is a doctrine of equity to protect purchasers, &c., from dormant, secret, or stale claims, of which the presumption is that the means of defence are lost; it is applied, not as a bar, but as evidence by the court; 5 Johns. Ch. Rep. 551; Laussat's Fonb. b. i. chap. 4, § 27; it involves an idea of repose from neglect, and is rebutted by any acts of opposition, its application is seen in 2 Ch. Rep. 114; Gilb. Eq. Rep. 224; 5 Johns. Ch. Rep. 551; the case here is very different, it is to effect a new acquisition, not to sustain an old one. It is to enable the releasing creditors to divide a new fund. It is to support a deed fraudulent in law from a physical defect staring every one in the face; can three or four years do this? What was the time? In 1837 the deed was made, in 1839 it was attacked; and it has been pressed vigorously in every variety of form from that day to this.

4. As to Sheepshanks' claim. By the decision of this court in Okie's Appeal, Okie was in no way affected by the decrees in favour of Sheepshanks, for he had no right to oppose them; they only affected the parties thereto; of course Wilson would not be protected in paying after notice of a defect in his title. What was the report?—A calculation of an auditor based on erroneous facts. Is this a judgment, a decree which cannot be gone behind—this private proceeding between two persons as to their respective rights; is this conclusive on a stranger to the whole matter claiming adversely to them both? This same auditor at a subsequent period restated this account, and his award is the conclusive one, if any, being the last.

*Meredith*, in reply.—This is an assignment of partnership, and separate property, executed by two partners out of three, and stipulating for a release. In Hennessey *v.* The West. Bank, the opinion delivered affirmed that such an assignment was void, even though it were proved that the non-executing partner had no property. The judgment in that case does not necessarily affirm that doctrine, as the same judgment must have been given, if the court had been of opinion that the burden of proving the non-executing partner's want of property, lay on those who supported the assignment. If this be so, then it is apprehended that in this case such want of property has been abundantly proved. If, however, the doctrine of the learned judge who delivered the opinion in Hennessey *v.* The West. Bank, be affirmed by the court, then certainly a very important question in this case must be decided against us. But if that doctrine

can be shown to be inconsistent with all previous cases and principles, it may be expected that the court will reconsider it, especially as it comes up again in the same controversy, has not yet passed into the body of the law, and there are no rights acquired on the faith of it, to be affected.

1. What was the law prior to Thomas v. Jenks?

2. What was the law under Thomas v. Jenks?

3. Is the doctrine laid down in Hennessey v. The West. Bank, inconsistent with the law as theretofore established?

1. On this first point, the citation of all the authorities would be interminable: the five cases will therefore be referred to, which were selected and quoted in the opinion delivered in Hennessey v. The West. Bank; they are McClurg v. Lecky, 3 P. R. 83; Passmore v. Eldridge, 12 Serg. & Rawle, 198; Adlum v. Yard, 1 Rawle, 163; Johnston v. Harvy, 2 P. R. 82, and McAllister v. Marshall, 6 Binn. 338.

McClurg v. Lecky, was a reservation of a salary to the assignor, out of the assigned estate. Johnston v. Harvy was a transfer by a father to his son reserving an annual support out of the estate conveyed; the gist of the case was that a part of the thing purporting to be assigned was shielded from creditors. In Passmore v. Eldridge, there were two objections: 1. The uncertainty what passed, and, therefore, that gross frauds might be thus covered. 2. The secret reservation of part of the property assigned. Adlum v. Yard does not touch this case: the point was, an illegal prohibition to the assignees to prevent a sale of the estate till a future period. The amount of the case is, that a part did not bonâ fide pass, as it was pretended. That was but the common law, as indeed we generally go under that, for by the statute the parties are criminally responsible. In McAllister v. Marshall, there was a re-transfer by the assignee for the wife of the assignor —the original assignment authorizing a compromise, and the court held the whole to be one transaction; so that, like the other cases, the property did not in fact pass, there being a secret agreement for a reconveyance. This was simply under the common law. Look to that law—I shall cite but two cases contemporaneous with our early decisions, familiar to the lawyers of that day, which show, not a new application of an old rule, but the settled understanding of what the law was. Estwick v. Caillaud, 5 Term Rep. 420; Ingliss v. Grant, Ibid. 530. The first of these cases shows, that an assignment for creditors, which would otherwise have been fraudulent, was supported, because it was of a part, and not of the whole. The latter was a commercial case; not affected by the bankrupt law; one partner assigning after the death of the other, and stipu-

2 P

lating for a release: Lord Kenyon refused to hear counsel in support of the assignment. It is said, that Burd v. Fitzsimmons is the only case in which the question of the validity of stipulations for releases was raised, and there it was decided in the negative. On page 80, it is expressly said, there was no release stipulated for in the assignment. Nor does any one of the judges there give that as a reason for his decision; on the contrary, (page 85, in note,) it is said to have been agreed by the counsel on both sides, that such releases were usual and common, and Smith, J., said it had been frequently so decided in the Supreme Court. This point had nothing to do with the case; it was the latent fraudulent use for the assignor that affected it. The question of the validity of stipulations for a release was afterwards brought up in Lippincott v. Barker, 2 Binn. 174, solemnly argued, and it has till now been supposed finally decided. In Estwick v. Caillaud, there was a reservation out of the fund assigned, but because the assignment did not include the whole estate it was sustained. That was the law as we received it. This case was unaffected by the bankrupt law, for the assignor was a peer. So of Ingliss v. Grant, the party there being domiciled in India. There one partner assigned, the other being dead, to certain joint and separate creditors, who covenanted if he would assign certain property, they would execute a general release. The estate of the deceased partner was of course excluded, and the court refused to hear argument in support of the assignment. King v. Wattson, 3 Price, 6, is to the same effect.

Thus stood the law prior to Thomas v. Jenks; not a trace of the doctrine that an omission of part was fraudulent; on the contrary, it received favour, as evidence that the assignment was not colourable, the part retained being left open to creditors. Thus it stood in Pennsylvania and England. There is not a case to be found anywhere prior to Thomas v. Jenks, that a partial assignment, stipulating for a release, was bad. Seaving v. Brinckerhoff was cited; what is said in that case on this subject was but an *obiter dictum*, and was repudiated the first time it was cited in the court in which it had dropped from a very learned judge—Wakeman v. Grover, the counsel there said: " Our case is stronger, for here there is no property left for those not coming in." 2. What then was decided in Thomas v. Jenks? That if the separate estate of the partner did not pass, then on proof of their being separate estate, the assignment was void; Seaving v. Brinckerhoff was before the court, and on that what did you do? Send a commission to take evidence and inquire whether or not there was property omitted. You put the

burden of proof on the party alleging the fact, that there was separate property. You say, "it depends on a single question of fact, which amply appeared from the report of the commissioner." Was it decided from facts appearing on the face of the instrument? no; extrinsic proof was required. Thomas v. Jenks was understood accordingly. It came under consideration in two subsequent cases, Bayne v. Wylie, and Fassitt v. Phillips. [Ch. J.—Permit an interruption. The English commercial cases are all within the bankrupt law; you have no cases there of joint and separate effects passing.] Ingliss v. Grant is such a case, and it is laid down at the start by Lord Kenyon, that the bankrupt law has no operation. [C. J.—Was it partial?] Yes; by one partner only; the other one dead. Bayne v. Wylie, 10 Watts, 309, was a case stated in an assignment professing to pass partnership effects alone, and a release stipulated for. This court sustained it. Why? It was agreed that there was no property, which did not pass by the assignment: that shows the understanding of counsel, and the decision showed the understanding of the court, that the question whether there was separate property, was a mere question of fact. Thomas v. Jenks was one of the cases relied on to overturn the instrument.

In Fassitt v. Phillips, the fact that there was property omitted was confessed in the answer. It was a worse case than Thomas v. Jenks, because the difficulty of choice was enhanced by a double uncertainty. Certainly Fassitt v. Phillips shook, or very materially limited, Thomas v. Jenks. The fact that property was omitted, being confessed, of course, no question could rationally arise, of what the court would do, if that fact had not been confessed. The result is, that Thomas v. Jenks was clearly understood (and so treated in two succeeding cases) to require affirmative proof to be made by the party seeking to overturn the assignment by reason of the alleged existence of property which did not pass by it.

3. Hennessey v. Western Bank is directly inconsistent with all that preceded it. It lays down, for the first time, the doctrine, that even proof that no property existed which did not pass by the assignment, is insufficient to sustain the instrument. It is the establishment of a new law, and not the administration of the old.

Most of the other points made by the appellants appear not to have been sufficiently examined, and they are, therefore, left upon the opening argument. It is impossible to conceive how the objection arising from lapse of time can be got over, except by annulling an express provision of the bankrupt law, under which Mr. Okie claims.

Supposing the law is not as contended for by my colleague, and all the property did not pass.   I submit, the stipulation for a release was a condition subsequent, and that it was void, not the instrument.   On this I refer to the argument in Weiner *v.* Farnum, 2 Barr, 146.   Look at the effects of the contrary rule :  what have the releasing creditors done to forfeit their rights ?   Released their debts, under a mistaken supposition that the property had passed.   The question is not, whether they were purchasers under a statute, but whether they have a right to keep what has been given to them, and our law is expressed in Lippincott *v.* Barker, where it was conceded that creditors releasing before executions levied, would have been protected though the assignment had otherwise been invalid.   I also add, if J. A. K. was not a party to the instrument, there is no stipulation for a release to a party to the deed whose property did not pass, but to a stranger.

*Fallon.*—Ingliss *v.* Grant differs in many respects; among others, it requires no release.

*Meredith.*—Page 532 shows the creditors were obliged to join in a composition deed.   I suppose your honours know what that means.

*Jan.* 30.   ROGERS, J.—The exceptions, which are five in number, may be embraced under a few general propositions, which comprise the whole case.   The point on which the case principally turns, namely, the invalidity of the assignment, has been already decided in Thomas *v.* Jenks, 5 Rawle, 221, and Hennessey *v.* The Western Bank, 6 Watts & Serg. 300 : the latter was a decision on the assignment now in controversy.   In those cases it is ruled, that an assignment by an insolvent debtor, stipulating for a release, is invalid unless it contains a transfer of all the debtor's property.   It has been regretted by some distinguished jurists, the late Mr. Justice Baldwin among the number, in Eustace *v.* Phillips, that the very fact of requiring a release from the creditors of an insolvent debtor, did not invalidate the assignment.   This point, however, he considers settled in Brashear *v.* West, 7 Peters, 615 ; but he says, the law is thus settled only when the assignment is of the whole of the debtor's property and effects, and that it is otherwise, if any portion is fraudulently kept back from the assignment.   In the latter case, the assignment is void by the exaction of a release from the creditors, according to the opinion of the Supreme Court of this state, in 5 Rawle, 221, as well as the soundest principles of law.   In Thomas *v.* Jenks, and Hennessey *v.* The Western Bank, we ruled, that such an assignment

was against the policy of the law; that the condition was oppressive without the colour of justice, and evinced on the face of the instrument a fraudulent design. That it was taking an unfair advantage of the situation of the creditor, to impose the condition of a release, unless on the terms of the surrender of all the debtor's property. We thought so then, and notwithstanding all that has been so pertinaciously and strenuously urged to the contrary, we are of the same opinion still.

These cases, as we conceive, introduce no new principle, but are nothing more than a correct application of a principle already settled in McAllister *v.* Marshall, 6 Binn. 338; Passmore *v.* Eldridge, 12 Serg. & Rawle, 201; Adlum *v.* Yard, 1 Rawle, 163; Johnston's Heirs *v.* Harvy, 2 Penna. Rep. 92, and McClurg *v.* Lecky, 3 Penna. Rep. 83. It is not my intention to endeavour to enforce the views taken in the cases cited; they speak for themselves. I am yet to learn, senseless repetition gives any additional force to an argument. But my respect for the counsel of the appellants, and I speak with the utmost sincerity and truth, induces me to notice the cases which are supposed to be in conflict with the cases ruled on this point. I allude to Estwick *v.* Caillaud, 5 Term Rep. 420, and Ingliss and others, assignees of Campbell, *v.* Grant, Ibid. 530.

Notwithstanding the apparent conviction with which those cases have been urged, I submit they differ in most essential particulars from the present. Estwick *v.* Caillaud, the first case, does little more than affirm a principle not disputed, that where the bankrupt laws do not interfere, a debtor may give a preference to particular creditors. In that case, no attempt is made to impose terms on the creditors by the exaction of a release, as a previous condition of partaking in the funds. If it be an authority bearing on this point, it seems to strike as well at McAllister *v.* Marshall, and the other kindred cases, as at Thomas *v.* Jenks, and Hennessey *v.* The Western Bank, cases which the counsel have not ventured to impugn. But what was the case of Ingliss *v.* Grant, on which the counsel for the appellant principally relied. The case was this. By an executory agreement, certain creditors agreed to release Campbell, the defendant, provided he would in four months assign *all* his estate in trust for the benefit of *all* his creditors; an assignment was afterwards made in fulfilment of the contract, to which all parties had previously bound themselves. The assignment was of *all the assignor's estate*, in trust for *all his creditors, releasing or otherwise*, and moreover the assignment makes no stipulation for a release. From the mere statement of the case, it is impossible to avoid seeing how very

unlike it is to the present case. In Thomas *v.* Jenks, the assignment is of a part; here it is of the whole of the debtor's property. In Thomas *v.* Jenks, the debtor stipulates for a release; in Ingliss *v.* Grant, he makes no such condition. In no one feature can the slightest resemblance be traced. But particular exception is taken to the latter case decided, because it makes the validity of the assignment depend upon the face of the deed itself, irrespective of the fact whether the debtor had or had not separate estate. My attention has been particularly requested to this distinctive feature of the case of Hennessey *v.* The Western Bank; but the more I reflect upon it, the more am I convinced of the propriety of the decision in this aspect. Indeed, when we consider that the instrument itself presents the case of a legal fraud on its face, it is difficult to imagine how we could come to any other conclusion. The case presents a simple rule of action, based upon principles of common honesty and fair dealing, by no means difficult to pursue by any person willing to do justice to his creditors. It has further the great recommendation of preventing strife and litigation, meteing out a measure of justice common to all the creditors. Whereas, a different rule, which makes the validity of the assignment to depend on matters *dehors* the instrument, would expose the rights of creditors to the uncertain determination of a jury. One jury to-day might decide the debtor had separate property; a different jury, of equal intelligence, to-morrow, that he had not. The consequence would be, that an assignment would be valid as to A., inoperative as to B., C., and the rest of the alphabet. The difficulties attending such a rule, if we dignify it as such, is illustrated by the present case, for although it has been repeatedly argued, the members of this court itself are by no means agreed on the point. Some, among whom I am one, believing that he has; others, equally confident, that he has not separate estate. It cannot, with truth, be said, that the law, as to its main features, ruled in the cases cited, took the profession by surprise, at least not the draftsman of the present assignment, who, it is very evident, was well aware of the rule so clearly laid down in the case, when the point was first ruled. The assignment is drawn with the special intention of conveying the estate of each of the partners, as well as the property of the firm. It was also designed, as is very plain, that it should be executed in the name of the firm, as well of each individual member of the partnership For that purpose, a seal is attached to the deed. That it was not so done proved unfortunate; and the parties are not the only persons who have had reason to regret the omission of the necessary formula. Had James A. Knox been

present when the deed was signed, much litigation would, in all probability, have been saved, as there is reason to believe more care would have been observed in the execution of the instrument. It was, however, executed under the pressure of circumstances which admitted of no delay, and hence has arisen all the difficulty which has attended the assignment. The case of Fassitt v. Phillips, 4 Whart. 399, to which so much importance is attached, is entitled to but little weight. The point ruled in Hennessey v. The Western Bank, was not brought to the notice of the court. It was nothing more than a motion to dissolve an injunction, which was made absolute because it would be mischievous to suspend the execution of the trust. The point could only properly arise at the hearing.

And thus the case stood on the former argument; but it is said that James A. Knox ratified the assignment; that the deed is voidable and not void. That it is good as between the parties to it, I am not disposed to deny; but as respects the non-releasing creditors, the deed is wholly inoperative; that is to say, it is the same as to them, as if no conveyance had been made; the property remaining in the debtor as before the assignment. McClurg v. Lecky, 3 Penna. Rep. 83. What effect an express ratification would have in a similar case, if made before the time given for the execution of releases, it is unnecessary to determine. But it seems to me very clear that, if ratified afterwards, it would have no operation whatever as against creditors who did not think proper to accede to the terms proposed in the assignment. For this would be doing great injustice to the non-releasing creditors, as *non constat*, but they would release had the separate estate been conveyed. It would be impossible to do them justice without allowing them to participate in the fund; but this does not form part of the argument of the counsel of the appellant. But be this as it may, what evidence have we of the alleged ratification, so as to pass the separate estate of James A. Knox. His letter of attorney merely empowers John Knox to execute a deed conveying the estate, real and personal, belonging to the firm of Knox, Boggs & Co., of which he was a member. It imports nothing more, for it omits all reference to his separate estate. Now, even admitting that the attorney had been in possession of this authority at the time the deed was signed, he could transfer no more than the partnership effects. But the truth is, the letter of attorney was not transmitted from Nashville, where James A. Knox was at the time the disaster befel the house, until the 3d June, 1837, which was not much short of a month after the deed of assignment was sealed and delivered. Nor do we see any force in the

suggestion that the subsequent conduct of James A. Knox, acting as agent of the assignees, can have any effect in altering the legal effect of the assignment. It amounts to nothing more than a ratification of an instrument, conveying the joint estate of the firm ; in that respect the deed required no ratification, as has been already ruled.

I say nothing, the case not requiring it, as to the point pressed on this argument for the first time ; that the deed was defective in this; that it was not executed in the name of the firm. It must be observed, that a ratification would be worth nothing to the non-releasing creditors, unless it has the effect of passing his separate estate to the assignees for the benefit of the creditors. But that the alleged ratification has this operation, is a proposition difficult to maintain. It is further urged, in support of the assignment, that the releasing creditors are purchasers for a valuable consideration. It is said, that, having paid value for the funds by releasing their debts, it is the duty of the assignees to retain them for their benefit. It is ruled that assignees, under a voluntary assignment for the benefit of the creditors, have no more rights than the assignor himself. Luckenbach v. Brickenstein, 5 Watts & Serg. 145. But this is the case of a bare assignment, without any act of the creditors superadded ; but where releases are executed, I am disposed to think that the releasing creditors place themselves in the position of purchasers, and as such are entitled to protection against a latent equity. But although this be so, I do not perceive how this principle can aid the creditors here ; for, to avail themselves of it, they must not only be purchasers for a valuable consideration, but purchasers without notice. Now the answer to this allegation is, that the taint which avoids the deed is apparent on the face of the assignment itself, so that even admitting them to be purchasers for a valuable consideration, they are purchasers with notice of the fraud. The releases are made with full knowledge of the vice of the deed, and therefore their position remains unchanged. They take their chance under the assignment, which may or may not prove advantageous. And in the case in hand, the releasing creditors have no just cause to complain.

It is understood the preferred creditors have been paid in full, and the releasing creditors have received seventy per cent. on the amount of their claims, *and all the other creditors require is,* that they may be permitted to divide, *pro rata,* the residue of the unappropriated estate. The ground on which the decisions are based is, that the assignment is a legal fraud, an unconscientious attempt, forbidden by public policy to coerce creditors. Of this the releasing creditors were apprized, and with full knowledge of this incurable *defect,* they

have voluntarily become parties to the deed. We do not perceive, therefore, in what manner they are injured. If a fraud, they are parties to it; if not, the releases were executed under a mistaken apprehension of their rights, and the result is the same whether the assignment be deemed a legal or moral fraud. And practically the releasing creditors are not injured, because if they will bring into the common fund the amount received, no difficulty will be interposed in allowing them to share the remaining assets *pro ràta*. *But without that, they must be content with what they have already recovered.*

It remains now to notice the exception, that the auditor exceeded his authority in reporting the funds invested, and the residue of the assets, to J. B. Okie, the insolvent assignee. To the report, in this respect, we see was no valid objection. It having been already shown that the appellant had no title to the fund, it follows that Mr. Okie, as the representative of the creditors, is entitled to receive it. To this appropriation of the assets the assignee interposes no objection; nay, he desires such a decree, and it would be unjust to expose him to an adversary suit, which must ultimately be ruled against him. Mr. Wilson has at all times since the cause was ruled against him, been desirous to avoid an adversary proceeding, and for this reason entered into the arrangement of the 16th October, 1844, which he is now willing to carry into effect in good faith. For his protection, he requests a decree of this court, to which we think he is entitled in every principle of justice. It is difficult to understand what right the releasing creditors, who have no interest in the unappropriated balance in the hands of the assignee, have to make any opposition to such a decree. The disposition of the balance is a matter between the assignee, who is but a stakeholder, having funds in his hands to which he pretends no title, and a person to whom he wishes to pay it, it having been already adjudged that to him it rightfully belongs. Mr. Wilson desires a credit on account, upon payment to the person entitled to it, and in this way to be discharged from his trust.

The course pursued by the auditor is indicated in Okie's Appeal, and is not obnoxious to the charge, that it recognises the claims of persons not within the provisions of the assignment, as it would be were the controversy between opposing creditors claiming under different rights—one under and the other in opposition to the assignment. A decree is requested by the person to pay, and the person who is entitled to receive the funds; it is opposed by those who have no interest in them whatever; it seems, therefore, to fall within

the ordinary power of the court, and is but an act of justice to the assignee, who requires the decree for his own indemnity. It does not call in question what has been already done; that is settled in Okie's Appeal. But as far as respects the money in hand, and not paid, as Mr. Justice Sergeant, in his opinion, says: it is for the accountant either to pay and ask credit, or to object to payment under the trust, and claim to pay it to others, or hold it as a stakeholder, to respond to adverse claims that may exist against it for his own security, and it is for the auditor to state the account of it, and decide in the first instance what course the accountant is legally bound to pursue. Here the accountant chooses to claim a credit for the funds in his hands when paying it, or, what is the same thing, delivering it to Mr. Okie, the trustee of Knox, Boggs & Co., and in conformity thereto, the auditor has made his decree, directing the accountant to pay and hand over the unadministered assets to the insolvent trustee. The assignment is avoided on the ground of fraud, an unconscientious attempt on the part of the debtor to coerce creditors, by the imposition of a choice which might prove unfortunate, and an exposure to a peril which they were not bound to encounter. And, moreover, this was a patent, not a latent defect, apparent on the face of the deed itself, to which the releasing creditors voluntarily made themselves parties. We therefore do not perceive in what manner the releasing creditors are injured; for if by a fraud, and whether legal as against the policy of the law, or moral, can make no difference; they are parties, and if not, then the releases, being executed under a mistaken apprehension, would not bind them. And this is certainly the case in the matter in hand; for no difficulty would be interposed; for, by bringing what has been received into the common fund, they will be permitted to take a *pro rata* dividend of the remaining assets.

It remains to notice some matters which have been pressed into the argument, namely, the imputed laches of the creditors, and the act of limitations. It must be observed that the *latter ground is not* assigned for error; but waiving this, after examining the point, we see nothing by which this defence can be sustained. Was the intention of this proceeding to unravel what has been done by the assignee, the allegation of laches would be entitled to more favour, for then it would materially affect the interests of the releasing creditors. But as it is not designed to disturb the execution of the trust, we cannot see the force of the objection. There is nothing in the delay, which is said to have taken place, which has worked an injury to the adverse party. Indeed, from the time they were aware of the defect

in the deed, they seem to have pursued their rights with great diligence, as the evidence, which it is not intended particularly to examine, abundantly shows.

A claim is put in in favour of Mr. Shcepshanks; it is a sufficient answer to this claim that he takes no exception to the report, nor has he appealed. But if he had, we see nothing in his case to entitle him to payment; he refused to receive it for some reason satisfactory to himself; we cannot therefore consider it in any other light than as part of the unadministered assets in the hands of the assignee; we see no warrant for the suggestion, that there is a final decree in his favour.

In order to avoid misapprehension, we wish to be understood as refraining from expressing any opinion whether Mr. Okie can sustain a suit against such creditors as it is alleged received money from the assignee without any debt being due; that is a question which may be worthy of investigation when it is regularly before us.

The report of the auditor is affirmed.